[Crim. No. 6334. Third Dist. May 4, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
ALEX RAMIREZ FERREL, Defendant and Appellant.

THE PEOPLE, Plaintiff and Respondent, v.
STEVE P. GUERRERO, Defendant and Appellant.

(Consolidated Cases.)

972

## COUNSEL

Roger A. Newlander, under appointment by the Court of Appeal, for Defendants and Appellants.

Evelle J. Younger, Attorney General, Herbert L. Ashby, Chief Assistant Attorney General, William E. James, Assistant Attorney General, Nelson P. Kempsky and John H. Darlington, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**REGAN, J.**—Alex Ramirez Ferrel was indicted for the crime of murder, a felony (Pen. Code, § 187), and in a separate count for the crime of assault upon the person of another while confined in a state prison for less than life, a felony (Pen. Code, § 4501). Steve P. Guerrero was accused by information of violations of said sections, to wit, Penal Code section 187, and Penal Code section 4501.

After a trial by jury, defendant Ferrel was found guilty of murder in the second degree. (Pen. Code, §§ 187, 189.) At the same consolidated trial, defendant Guerrero was found guilty of voluntary manslaughter, a lesser included offense of murder. (Pen. Code, § 192.1.) Both defendants appeal from their respective judgments of conviction.

### FACTS

On October 6, 1970, Correctional Officer Snell was on duty as the K-2 isolation officer in the maximum security disciplinary unit at Deuel Vocational Institution. The unit consisted of 24 isolation cells.

On that date, at approximately 8:30 a.m., Officer Snell began allowing the inmates to shower and exercise. Two cells were opened at a time and the occupants thereof were allowed to shower, exercise, and visit with friends occupying other cells along the tier. At about 1 p.m., Officer Snell released defendants Ferrel and Guerrero from cell 241 and inmates Wilson and Wilkins from cell 242.

Wilson and Wilkins showered first and then walked to the north end of the tier. The defendants then showered and when they finished began walking back toward their cell in a northerly direction. When the defendants were abreast of their cell, Officer Snell ordered them to "lock up." Defendants ignored this command and proceeded on down the tier toward Wilson and Wilkins.

Immediately thereafter the defendants started fighting Wilson and Wilkins. Snell observed defendant Ferrel make a jabbing motion directed against Wilson and saw a dark object in Ferrel's hand. At the same time defendant Guerrero was hitting and kicking Wilkins but Snell did not see any object in Guerrero's hand. Officer Snell blew his whistle for assistance and three officers arrived on the scene. Tear gas was then used to quell the altercation. Snell noticed that both Wilson and Wilkins had blood on their chests.[1]

---

[1]Wilkins subsequently died as a result of his wounds.

According to Wilson, one of the victims of the attack, the fight stemmed from a racial flareup which occurred the previous weekend.[2] That prior Saturday night, the "Chicano Mexicans" in the unit started "night training," which consisted of starting fires, flooding their cells, making a lot of noise and calling the officers "pigs." When fire was thrown into the cell occupied by Wilson and Wilkins, Wilkins tried to push it away. Wilson heard somebody say, "Get back, Nigger."

On the day of the incident, Wilson and Wilkins were talking to another inmate prior to returning to their cell. When Officer Snell told all four men to "lock up," Wilson observed defendants continue to pass their cell and continue toward him and Wilkins. When defendant Ferrel was approximately 25 feet away, he made a move toward his pants and pulled out a long piece of steel which appeared to be a bed spring with a piece of towel wrapped around one end. Ferrel approached Wilson and began "jigging" or sticking Wilson. When he stuck Wilson in the lung, Ferrel said, "I got your heart." Wilson was stabbed a total of nine times. During this time Guerrero and Wilkins were on the ground fighting.

Ferrel finally released Wilson and went after Wilkins, while Wilson ran down the hall. Wilson observed Ferrel sticking and stabbing Wilkins. Guerrero at the time was kicking Wilkins while Wilkins lay on the floor. Wilson did not see any weapon in Guerrero's hand.[3] The fight was stopped when three officers entered the tier.

Correctional Officer Stephen Jones was one of the three officers who responded to the alarm whistle. When Jones entered the tier, he saw defendant Ferrel leaning over Wilkins, who was lying on the ground. Ferrel was stabbing Wilkins in the chest area with what looked like a bed spring, approximately 4 to 6 inches long. Ferrel stopped his attack when the tear gas or Febat was fired. As Ferrel fell back from the gas, he passed his weapon into cell 227 to an inmate named Sanders. As Officer Jones attempted to subdue Ferrel, he saw Sanders flushing the toilet, but he did not see what Sanders had dropped in the toilet. Jones did not recall observing any injuries to defendants at that time.

Officer Calderon also responded to the whistle. When he entered the area he saw Wilkins on the floor and both defendants on top of him.

Officer Kuykendall was the third officer to respond to the alarm. When he proceeded into the tier, he observed Ferrel bending over Wilkins striking at him in an overhand motion. Guerrero was hitting and kicking

---

[2]Both Wilson and Wilkins were blacks. Defendants were Chicanos or Mexican-Americans.

[3]Wilson denied that either he or Wilkins had a weapon.

Wilkins, but he had no weapon in his hand. Officer Kuykendall then discharged the tear gas. When the officers separated the inmates, Kuykendall noted that Wilkins was bleeding quite badly. As the officers were searching defendants and Wilson,[4] Ferrel turned to Wilson and said, "Yeah, I stabbed you right in your black heart, didn't I?"

Wilkins died on October 22. The stab wounds were the cause of death.

Six inmates who were incarcerated in the K-2 isolation center on October 6 during the altercation testified for the defense. All stated that the black inmates, Wilson and Wilkins, had the weapons and were the aggressors.

Guerrero testified in his own behalf, stating that Wilson and Wilkins pulled knives and he acted only in self-defense.

■ Defendant Ferrel contends that his conviction of second degree murder is inconsistent with defendant Guerrero's conviction of voluntary manslaughter because Guerrero could not have aided and abetted the commission of any crime other than that committed by Ferrel.

In view of the prosecution's theory of the case, it is true that the verdicts are inconsistent. Nevertheless, the verdicts can stand where, as here, the inconsistent verdicts are against multiple defendants. Where the evidence warrants the jury holding the perpetrator of the homicide guilty of murder in the second degree, neither he nor his accomplice may complain about an inconsistent verdict convicting the accomplice of a lesser offense. (*People* v. *Finch* (1963) 213 Cal.App.2d 752, 777 [29 Cal.Rptr. 420]; see *People* v. *Powell* (1949) 34 Cal.2d 196, 205 [208 P.2d 974]; *People* v. *Muza* (1960) 178 Cal.App.2d 901, 905 [3 Cal.Rptr. 395]; *People* v. *Smith* (1931) 117 Cal.App. 530, 534 [4 P.2d 268]; *People* v. *Horowitz* (1933) 131 Cal.App.Supp. 791, 793-794 [19 P.2d 874].) Defendant Guerrero "had the benefit of the jury's compassion, rather than suffering a burden because of its passion. . . ." (*People* v. *Smith, supra,* 117 Cal.App. at p. 534.) Defendant Ferrel may not attack his conviction of murder on this basis. (See *Dunn* v. *United States* (1932) 284 U.S. 390, 392-393 [76 L.Ed. 356, 358-359, 52 S.Ct. 189, 80 A.L.R. 161].)

■ Defendant Guerrero contends that he was denied due process of law because he was not afforded a hearing at which he could test the validity of his rejection by the California Youth Authority.

At the time of the commission of the crime, Guerrero, then 17 years of age, was already under commitment to the Youth Authority. The trial judge sentenced him for the present crime to the Youth Authority, the sentences to be consecutive. However, he was rejected by the Youth

---

[4] Wilkins had been instructed to stay on the floor because of his wounds.

Authority pursuant to section 1737.1 of the Welfare and Institutions Code[5] and returned to the court for sentencing to state prison. Thus, in effect, defendant Guerrero is contending that this section violates due process since it does not afford the rejected individual a hearing.

This issue was not raised in the trial court at any stage of the proceedings. ■ Generally, the failure of counsel to raise issues at the trial level precludes raising those issues on appeal for the first time. (*People* v. *St. Martin* (1970) 1 Cal.3d 524, 537-538 [83 Cal.Rptr. 166, 463 P.2d 390]; *People* v. *Campbell* (1965) 233 Cal.App.2d 38, 47-48 [43 Cal.Rptr. 237].)

■ Even assuming that the point can be raised on appeal, the contention has no merit. (Cf. *People* v. *St. Martin, supra,* 1 Cal.3d at p. 538; *Pope* v. *Superior Court* (1970) 9 Cal.App.3d 649, 652 [88 Cal.Rptr. 491].) ■ In this regard, the language of the Supreme Court in *In re Tucker* (1971) 5 Cal.3d 171, 179 [95 Cal.Rptr. 761, 486 P.2d 657], is appropriate in answering defendant's contention: " ' " Due Process" is an elusive concept. Its exact boundaries are undefinable, and its content varies according to specific factual contexts. . . . Whether the Constitution requires that a particular right obtain in a specific proceeding depends upon a complexity of factors. The nature of the alleged right involved, the nature of the proceeding, and the possible burden on that proceeding, are all considerations which must be taken into account.' [Citations.] ■ Those elements of due process deemed essential for the protection

---

[5]Section 1737.1 of the Welfare and Institutions Code reads:

"Whenever any person who has been charged with or convicted of a public offense and committed to the authority appears to the authority, either at the time of his presentation or after having become an inmate of any institution or facility subject to the jurisdiction of the authority, to be an improper person to be retained in any such institution or facility, or to be so incorrigible or so incapable of reformation under the discipline of the authority as to render his detention detrimental to the interests of the authority and the other persons committed thereto, the authority may return him to the committing court. In the case of a person convicted of a public offense, said court may then commit him to a state prison or sentence him to a county jail as provided by law for punishment of the offense of which he was convicted. The maximum term of imprisonment for a person committed to a state prison under this section shall be a period equal to the maximum term prescribed by law for the offense of which he was convicted less the period during which he was under the control of the Youth Authority. The Adult Authority may, after seeking the advice of the Youth Authority, allow any such person time credit reductions from his term of confinement according to the table set forth in Section 2920 of the Penal Code for the time during which such person was under the control of the Youth Authority. In the case of a person who has been committed to the authority by a juvenile court, the juvenile court to which he is returned may make such further order or commitment with reference to such person as may be authorized by the juvenile court law, except that said court may not recommit such person to the Youth Authority."

of one accused of a crime are not inevitably guaranteed to one duly convicted of a crime. If the accused has been fairly tried, defended, convicted and sentenced, and has been afforded reasonable opportunity to appeal his conviction, the essential demands of due process have been fulfilled. ■ *Once the adjudicative process has ceased and the rehabilitative stage commenced, it becomes the responsibility of the Adult Authority to determine, in its discretion, the appropriate terms and conditions for the release of the offender to society. At this stage, due process only requires that the Adult Authority discharge its responsibilities in good faith, neither arbitrarily nor capriciously, and that judicial review remains available to correct abuses of discretion.* [Citation.]

"Moreover, in determining whether or not a particular procedure violates due process requirements, we should bear in mind the probable costs and consequences involved in casting excessive burdens upon administrative machinery. [Citations.]" (Italics added.)[6]

■ We hold that section 1737.1 of the Welfare and Institutions Code does not violate due process of law. (Cf. *People* v. *Woolbert* (1965) 232 Cal.App.2d 544, 547 [42 Cal.Rptr. 919].) The statute is designed to facilitate the handling by the Youth Authority of juvenile offenders who, in the opinion of the authority, are amenable to treatment through its available resources. It would cast an excessive burden upon the administrative machinery at this junction for this court to order a hearing after the Youth Authority rejected defendant Guerrero. (*In re Tucker, supra,* 5 Cal.3d at pp. 179-180.) It is clear from the record that the Youth Authority did not abuse its discretion in rejecting Guerrero.

The judgments are affirmed.

Richardson, P. J., and Biddick, J.,* concurred.

The petition of appellant Ferrel for a hearing by the Supreme Court was denied July 19, 1972.

---

[6]The language of *Tucker, supra,* while it speaks of the action of the "Adult Authority" is dispositive of the issue raised here in the action before the "Youth Authority."

*Assigned by the Chairman of the Judicial Council.