[Crim. No. 5748. Fifth Dist. Aug. 31, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
FRANK LUPE ROCHA, Defendant and Appellant.

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Augustus E. Noland, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Charles P. Just and Shirley A. Nelson, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

ANDREEN, J.—Appellant, age 18 at all times mentioned herein, pled guilty to assault with a deadly weapon (Pen. Code, § 245, subd. (a)). The court committed him to the California Youth Authority (YA or Authority), which rejected him. Thereupon he was sentenced to prison for a term of four years.

His appeal challenges his rejection from the Authority, alleging he was denied due process, that the prohibition against ex post facto laws was violated, and that the policy under which he was excluded is void for failure to comply with the California Administrative Procedure Act (Gov. Code, §§ 11340-11528).

The facts are unimportant to our decision, so may be summarized: as a result of a street altercation, appellant stabbed the victim in his left eye.

The crime and the commitment to prison occurred in 1981.

DUE PROCESS

Appellant places primary reliance on *People* v. *Ramirez* (1979) 25 Cal.3d 260 [158 Cal.Rptr. 316, 599 P.2d 622] for the proposition that his "summary" rejection violated his due process rights. He contends he should have been physically present at the YA facility, interviewed regarding the facts and circumstances of the case, and accorded the other rights accorded defendants under *Ramirez*.

The procedural history of this case is unremarkable. After the entry of the plea, the matter was referred to the probation office for a presentence investigation and report. (Pen. Code, § 1203.) The report as filed

with the court contained information detailing appellant's prior record, commitments to institutions and performance on probation. We may assume that this report was forwarded to the Authority. (Welf. & Inst. Code, § 1741; Pen. Code, § 1203, subd. (b); Keene, Cal. Criminal Trial Judges Benchbook (1981) pp. 471-473.)

The Authority used a point system to assess the level of criminality to determine whether it would accept appellant.[1] The point system, which is detailed below, utilized five objective factors in making a determination of whether to accept appellant pursuant to section 1731.5 of the Welfare and Institutions Code.[2] The five are, length of commitment, number and severity of priors, whether the offense pattern is escalating or deescalating, criminal sophistication and prior secure program placements. Based upon that system, appellant earned 16 1/2 points. Anybody with over 11 points is excluded. This procedure resulted in rejection of appellant.

We turn to an analysis of *Ramirez* in order to determine whether appellant's due process rights were violated by the procedures used in his case.

*Ramirez* adjudicated the rights of a person who was committed to the California Rehabilitation Center (CRC) because he was, or was in imminent danger of becoming, a narcotic addict. (Welf. & Inst. Code, § 3051.) After some three years of treatment, Ramirez was placed on outpatient status. Two years later he was arrested for disturbing the peace. The Director of Corrections subsequently found that he was not fit for treatment at CRC. There was then a superior court hearing on the propriety of the order excluding the defendant from CRC; the trial court held the Director of Corrections did not abuse his discretion. His criminal proceedings were resumed and he was sentenced to prison.

Our Supreme Court reversed on the ground that procedural protections were denied defendant prior to his exclusion from CRC. The court

---

[1] Pursuant to appellant's request, we have taken judicial notice of the classification system in use by the Authority when making its decision of whether to accept a person over 18 and under 21 who was committed by an adult court. (Evid. Code, § 459, subd. (a).) The policy is set forth in the appendix.

[2] Welfare and Institutions Code section 1731.5 provides, inter alia, that a court may, after certification to the Governor, commit a person less than 21 years of age at the time of apprehension provided that the individual is not convicted of first degree murder committed as an adult, and the sentence is not one of death, life imprisonment, imprisonment for 90 days or less or ordered to pay a fine, and is not subject to a probationary term for the subject offense. YA accepts or rejects on the basis of whether the individual can benefit from its programs and upon availability of adequate facilities.

relied on state (Cal. Const., art. I, §§ 7, subd. (a), 15), not federal, constitutional grounds. It rejected the federal test that conditions a due process liberty interest on the existence of a state statute which permits forfeiture of the interest only on the happening of specified conditions. This was criticized by the California court as permitting a state to exclude an interest from constitutional protection by the simple expedient of placing unconditional discretion in a state officer. (*People v. Ramirez, supra,* 25 Cal.3d at pp. 266-267.)

Our court opted for a rule which weighs governmental and private interests in determining what procedural protections are warranted to promote accurate and reliable administrative decisions and to ensure freedom from arbitrary adjudicative procedures. This requires a consideration of four factors: the private interest involved (in *Ramirez* the inmate's interest in being in CRC rather than prison); the risk of a mistake—an erroneous deprivation of such interest through the procedures used—and the probable value, if any, of procedural safeguards; the dignitary interest of the individual by informing him of the nature, grounds and consequences of the action and enabling him to present his side of the story; and the governmental interest, including administrative burdens that additional or substitute procedural requirements would entail. (*Id.,* at p. 269.)

The decision made by the Director of Corrections was whether to continue Ramirez on an inpatient basis. This decision required a subjective evaluation of the probabilities of the addict's success and his effect on others in the program. (*Id.,* at pp. 273, 275.)

It was noted that an exclusion from CRC carries with it a right to judicial hearing conducted by the superior court. If the court finds an abuse of discretion it may require the director to reconsider his decision or may return the defendant to the rehabilitation center for execution of its original commitment order. The court noted that if the director's decision is based solely on incorrect considerations, subsequent judicial review may correct any mistake. However, if correct evidence supports the director's decision, a deferential abuse-of-discretion standard may lead to affirmance even though the director may have reached a contrary result had he known that certain facts upon which he based his decision were incorrect. Because of this, due process considerations entitle a patient-inmate to minimal due process safeguards: statement of grounds upon which the exclusion order was made, access to informa-

tion used in reaching the decision,[3] notice of the right to respond, and a right to respond orally before a responsible official before the final exclusion decision is made. (*Id.*, at pp. 274-275.) It was deemed important to permit such oral participation in order to resolve conflicting information and to introduce subjective factors into the process, all with a view to enhancing reliability of the decision and promoting the dignity of the individual. More formal hearing rights such as the right to confrontation and cross-examination and right to counsel were not required in the context of an excluded CRC patient-inmate.

*People* v. *Broun* (1980) 109 Cal.App.3d 284 [167 Cal.Rptr. 169] refused to extend *Ramirez* to rejection decisions by the California Youth Authority. made pursuant to section 1731.5 of the Welfare and Institutions Code. The rationale was that Ramirez had been *accepted* by CRC while Broun had been *rejected* by YA. We doubt that such a due process determination should be dependent on whether or not a person has attained the status of an inmate of an institution. As the *Ramirez* court stated: "... when a person is deprived of a statutorily conferred benefit, due process analysis must start not with a judicial attempt to decide whether the statute has created an 'entitlement' that can be defined as 'liberty' or 'property,' but with an assessment of what procedural protections are constitutionally required in light of the governmental and private interests at stake." (*People* v. *Ramirez, supra*, 25 Cal.3d at p. 264.) This indicates to us that we should employ the four-step analysis set forth in *Ramirez* irrespective of whether appellant was an inmate.

We further note that although *Broun* purported to distinguish *Ramirez*, the courts faced different issues. In *Broun* the question presented was the availability of *judicial review* of an administrative decision. In *Ramirez*, as in the instant case, the question presented is whether there is a due process right to an *administrative hearing* before the agency, and if so what procedural protections should be afforded.[4]

As noted earlier, as to the 18- to 21-year-old group, the California Youth Authority need accept only those committed to it who it believes can be materially benefited by its reformatory and educational discipline and for whom it has adequate facilities to provide such care. (Welf. & Inst. Code, § 1731.5, subd. (b).) Any judicial review of a de-

---

[3]The need for confidentiality may delimit access to certain limited types of information. (*Id.*, at p. 275, fn. 5.)

[4]Another point of difference between *Broun* and the instant case is that in *Broun* the defendant was rejected because he was not amenable to the Authority's programs, while in the instant case the appellant was suitable, but was rejected on the ground that adequate facilities were not available.

cision to reject[5] would be subject to the same factors as exist on review of the exclusion of an addict to the California Rehabilitation Center. Accordingly, there is a concomitant need to ensure that the Authority makes its decision based upon accurate data. Appellant contends that this requires his presence at, and participation in, the decisionmaking process.

■ We turn to an analysis of the four factors delineated in *Ramirez* in order to determine whether such presence and participation is required under the state's due process clause.

(1) The private interest. Although one incarcerated in an institution operated by the Authority is physically restrained (*People v. Olivas* (1976) 17 Cal.3d 236 [131 Cal.Rptr. 55, 551 P.2d 375]), there is a substantial difference between incarceration in a prison and incarceration in a treatment facility under the control of the Authority both in terms of conditions of restraint and in length of confinement.

The differences have been intensified by the enactment of the Uniform Determinate Sentencing Act, effective July 1, 1977, which represented a significant and substantial shift in penological theory. The Legislature provided that "[T]he purpose of imprisonment for crime is punishment. This purpose is best served by terms proportionate to the seriousness of the offense with provision for uniformity in the sentences of offenders committing the same offense under similar circumstances." (Pen. Code, § 1170, subd. (a); cf. Cal. Rules of Court, rule 410(c) which lists as a general objective in sentencing: "Encouraging the defendant to lead a law abiding life in the future and deterring him from future offenses.")

The mission of the Authority, on the other hand, is not retribution but to protect society by rehabilitation. (Welf. & Inst. Code, § 1700.)

It follows that the private interest is a substantial one.

(2) Risk of an erroneous decision. The risk of an erroneous decision is slight. Objective factors are used in the rejection decision. These are set out on a "Level of Criminality" form (*post*, p. 609 of appen.). The com-

---

[5]We are not called upon to pass on the question of whether a person rejected from YA is entitled to a hearing before the superior court. (Compare *People v. Broun, supra,* 109 Cal.App.3d at p. 288 with *People v. Ferrel* (1972) 25 Cal.App.3d 970, 975-977 [102 Cal.Rptr. 372].)

putation actually compiled in appellant's case is set forth in the margin.[6] Although presumably not routinely sent with the letter of rejection, it was readily available to appellant's attorney and there is no reason to believe that a defense attorney or court which needed it could not obtain one.

---

[6] "Department of the Youth Authority

Criminal Court Commitment
LEVEL OF CRIMINALITY

"Name Rocha, Frank DOB: 9-17-62 County Fresno

Value

"1. Commitment Behavior
 (Take confinement time from court order:
 1 year = 1 point) . 4
 245(a)

"2. Offense Pattern—Magnitude 4 1/2
 (Total mid-terms from Penal Code for all prior
 sustained offenses: 1 year = 1 point)

"3. Offense Pattern—Escalation 2
 (See description)

 High 3 points
 Moderate 2 points
 Limited 1 point
 None 0 points
 De-escalation −1 point

"4. Criminal Sophistication/Orientation 3
 (See description)

 High 3 points
 Moderate 2 points
 Limited 1 point

"5. Prior Secure Program Placements 3
 (See description)

 State level 5 points
 Two or more local 3 points
 One local 2 points
 None 0 points

 "TOTAL VALUE SCORE 16 1/2

"Date: 7-16-81
"Remand _____
"Accept _____ [signature]
"Reject x " Intake Consultant

An examination of the factors which make up the form indicate how objective it is. The first two items—commitment behavior and offense pattern—are mechanical. (See appen., *post*, p. 610.) The only chance for error would be erroneous information supplied by the committing court. This, in turn, is minimized, since the probation report which is sent to the Authority is served upon the defense attorney at least nine days prior to the sentencing hearing (Pen. Code, § 1203, subd. (b)). Any error contained in the report may be corrected at the sentencing hearing.[7] Items 3 and 4 on the form, although requiring a capacity to reason and apply facts to the criteria set forth, are basically objective in nature. (See appen., *post*, pp. 610-611.) Item 5 is mechanical.

This point system should be contrasted with the methodology used in making a decision in reference to CRC commitments. Welfare and Institutions Code section 3053 requires that before the director may exclude a person from CRC, he must conclude "that the person, because of excessive criminality or for other relevant reason, is not a fit subject for confinement or treatment ...." (*Id.*, subd. (a).) The *Ramirez* court commented upon the "inherently subjective" factors facing the director which require the appraisal of a wide variety of considerations. (*People* v. *Ramirez, supra*, 25 Cal.3d at p. 273.) These subjective factors argue for the participation of the addict in CRC evaluations; the absence of them in the Authority's point system lessens the chance of error and indicates no real need for the defendant's corporeal presence at the time of administrative decision.

---

[7]Although we know of no case or statute which would require an erroneous statement in a probation report to be corrected prior to being forwarded to the institution, such would be good practice and an efficient way to comply with the requirements for information provided in title 15, California Administrative Code which provides in part that:

"(b) At the time of commitment to the Youth Authority, the committing court and/or probation department shall provide the following for each person:

"........

"(A) Public offense(s) sustained by the court, including enhancements.

"(B) Aggravating or mitigating circumstances, when applicable.

"........

"(3) Three copies of reports containing the following case information, unless it is already in possession of the Department:

"........

"(D) History of all of the person's criminal/delinquent behavior which resulted in a finding of guilt, i.e., date of arrest, sustained criminal charges, circumstances surrounding the offense and degree of involvement.

"(E) Description of prior efforts to help the person change his behavior, i.e., programs used (e.g. probation, county camp, etc.), length of participation, degree and willingness to participate, and evaluation of results." (Cal. Admin. Code, tit. 15, § 4168.5.)

Appellant also relies on *People* v. *Reyes* (1980) 107 Cal.App.3d 976 [166 Cal.Rptr. 127], which held that the due process rights afforded a person whose treatment at CRC is being terminated are equally applicable to a person whose treatment in the mentally disordered sex offender (MDSO) program is being terminated.

A substantial difference exists between the MDSO laws (as they existed prior to the legislative change in 1981) and a decision under section 1731.5 of the Welfare and Institutions Code. A person was confined as a mentally disordered sex offender because of his *status* as such. (*People* v. *Feagley* (1975) 14 Cal.3d 338, 359 [121 Cal.Rptr. 509, 535 P.2d 373].) The desirability of the presence of a person alleged to be in that category at the time of making a decision as to whether such a status exists is obvious.

(3) Dignitary interest. A due process consideration includes the dignitary interest in informing individuals of the nature, grounds, and consequences of the action and in enabling them to present their side of the story before a responsible governmental official. Information concerning the nature and grounds of the action are imparted by the Authority's rejection letter and access to the "Level of Criminality" form. The defendant's attorney may impart information to his client concerning the consequences of the action.

In reference to the opportunity to present the defendant's side of the story to the governmental official, a defendant may, through his counsel, submit additional information to the Authority. (Cal. Admin. Code, tit. 15, § 4169.)

Although it is true that under present YA procedures a defendant may not appear before the Authority in person in order to present his case, a defendant is afforded some feeling of involvement through participation in the initial hearing on the report of the probation officer, which immediately precedes the action of the Authority.

The dignitary values enunciated in *Ramirez* and stressed in *People* v. *Reyes, supra,* 107 Cal.App.3d 976 were evaluated in the context of the termination of one being treated at the California Rehabilitation Center (Ramirez) and one whose treatment in the mentally disordered sex offender program is being terminated (Reyes). Such a decision does not immediately follow a formal court proceeding. Although the procedure used in the instant case does not accord appellant with the dignity of a

hearing before the administrative agency, he is accorded a greater sense of participation than were Ramirez and Reyes.

(4) The government interest. A transfer of each person committed to the Authority so that he could participate in the acceptance/rejection decision would be burdensome and expensive. The documents of which we have taken judicial notice were promulgated because of serious overcrowding in the institutions. The procedure argued for here would take up additional bed space. Also, transportation to the facility is expensive. Additionally, the processing of all persons—those who were to be rejected as well as those to be accepted—through the intake facilities would be time consuming and expensive. The administrative burdens in the instant case are significantly greater than in *Ramirez* or *Reyes* by reason of the fact those defendants were already present in the facility,[8] whereas in the instant case the appellant would have to be transported to and admitted to the facility.

A weighing of the four factors impels the conclusion that a prospective inmate does not have a due process right to those safeguards prescribed in *Ramirez*. The administrative decision is almost a mechanical one, not needing a personal evaluation. Therefore, the chance for error is minimal. Some dignitary interest is provided by established procedures. The administrative burden would be substantial. These factors outweigh the admitted private interest that the committee has in assuring an appropriate decision.

## Ex Post Facto

■ Appellant's next contention is that the rejection of his YA commitment violates the ex post facto proscriptions in the state and federal Constitutions. Appellant argues (1) that when he committed his crime the exclusion policy was not in effect,[9] (2) the policy resulted in his being sentenced to state prison, (3) it was thus an invalid imposition of increased punishment. Although the exclusion policy was promulgated after he committed his crime, there is no merit to this argument.

The purpose of ex post facto prohibitions is, "to assure that legislative Acts give fair warning of their effect and permit individuals to rely on

---

[8] We infer Ramirez was in the facility because a court commits the patient-inmate to CRC without awaiting exclusion or acceptance.

[9] The crime was committed on April 5, 1981. YA promulgated the new classification scheme June 22, 1981. It was mailed to state courts on July 2, 1981.

their meaning until explicitly changed. [Citations.] ... [¶] [T]wo critical elements must be present for a criminal or penal law to be *ex post facto*; it must be retrospective, that is, it must apply to events occurring after its enactment, and it must disadvantage the offender affected by it." (*Weaver* v. *Graham* (1981) 450 U.S. 24, 28-29 [67 L.Ed.2d 17, 23, 101 S.Ct. 960, 964, fns. omitted.)

In *People* v. *Sobiek* (1973) 30 Cal.App.3d 458, 472 [106 Cal.Rptr. 519, 82 A.L.R.3d 804], it was stated: "A statute has an ex post facto effect when it alters the situation of an accused to his disadvantage by: (a) making criminal an action innocent when done; (b) making more serious an act already criminal when done; (c) inflicting greater punishment than that attending the act at the time it was committed; or (d) permitting a person to be convicted with less evidence than was required when the act was done. [Citations.] The doctrine does not apply to trivial matters but to some vested and substantial right possessed at the time of the offense."

Section 1731.5 was enacted in 1941 and always has provided for commitment if "in the opinion of the Authority, proper and adequate facilities [exist]." (Stats. 1941, ch. 937, § 1, p. 2526.) The wording in the current statute has been present since its amendment in 1969. (Stats. 1969, ch. 785, § 2, p. 1602.)

The criterion—adequate facilities—by its nature changes from time to time, depending upon capital improvements, level of funding and numbers and types of commitments. The regulations by which these decisions are made have been recently promulgated, but the right to exclude has existed since 1941. This right has been exercised. In a similar situation for instance, the trial judges of this state for many years dealt with a lack of sufficient YA facilities for severe psychotics.[10] Whether or not adequate facilities exist at the time of commitment is a chance a defendant takes.

The purpose of the prohibition against ex post facto laws has been fulfilled in appellant's case—that of assuring fair warning of the effect of legislative acts. (*Weaver* v. *Graham, supra*, 450 U.S. at p. 28 [67 L.Ed.2d at p. 23, 101 S.Ct. at p. 964].) Appellant had "fair notice" that his commitment to YA could be rejected on the basis of inadequate fa-

---

[10]See generally, Thompson, California Juvenile Court Deskbook (2d ed. 1978) section 9.22, page 175.

cilities. It is not possible to argue that the Legislature increased appellant's punishment or otherwise disadvantaged him beyond what was prescribed when the crime was committed.

### ADMINISTRATIVE PROCEDURES

*Is the policy under which appellant was excluded from the Youth Authority void for failure to comply with the California APA?*

■ Appellant next contends the YA "policy" which resulted in his exclusion from the Authority is in reality an invalid regulation because it was not promulgated in compliance with the California Administrative Procedure Act (APA). (Gov. Code, §§ 11340-11528.)

The failure of YA to comply with the APA was not raised at the trial of this action. Points not properly raised below ordinarily are waived. (*Rice* v. *Southern Pacific Co.* (1967) 247 Cal.App.2d 701, 710-711 [55 Cal.Rptr. 840]; see 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 276, pp. 4265-4266.)

Appellant cites *Armistead* v. *State Personnel Board* (1978) 22 Cal.3d 198 [149 Cal.Rptr. 1, 583 P.2d 744] as authority that we should consider this question. *Armistead* does not so hold. Nothing in it relates to the question of whether the issue was raised for the first time on appeal. We are asked to read the superseded Court of Appeal opinion in order to determine the issues as framed in the trial court. We comply, since doing so is in no way a citation prohibited by California Rules of Court, rule 977.

In the Court of Appeal decision both the majority and dissent discussed the APA. The majority stated that both parties agreed that the section of the Personnel Transactions Manual in question "relates only to the *internal management* of the agency," thus exempting it from the requirements of the APA. The dissent rejected that characterization. Neither discussed the issue of whether or not the matter had been raised in the trial court. Our Supreme Court did not discuss whether the issue had been raised for the first time on appeal. We assume if that issue had been germane, it would have been discussed.

At the very most, *Armistead* is no direction to consider an issue not raised below.

Although we have taken judicial notice of the Authority's screening criteria, it is another step to use the judicial notice procedure as a method of testing the criteria's legality under the APA. At the trial level, Authority representatives could appear to introduce relevant testimony and documents. They could explain the Authority's position and any rationale it may have for why the APA procedures are not applicable. If this occurs, a record appropriate for appeal would be perfected.

We decline to review this issue; it is simply not ripe for appeal.

Respondent urges us to hold that appellant's remedy at the trial level was by way of declaratory relief or mandate.[11] Since appellant was affected by the Authority's point system, he had an absolute right to contest it in his criminal action. No civil action was necessary. Had he challenged the validity of the policy at sentencing, YA would have had a right to appear as amicus curiae (see generally 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 215, pp. 1889-1891). Although as an amicus, the Authority would not have status as a party with right to appeal, such is not determinative. If the Authority lost at the trial level it would be subject to but one order affecting one defendant. If the defendant lost, he could raise the point on appeal. On appeal, YA's attorney, the Attorney General, could adequately represent its interests.

CONCLUSION

The judgment is affirmed.

Franson, Acting P. J., and Morony, J.,* concurred.

A petition for a rehearing was denied September 22, 1982, and appellant's petition for a hearing by the Supreme Court was denied October 28, 1982.

---

[11]Although, as appellant points out, respondent cannot consistently argue that YA's "policy" is outside the APA and yet argue that it must be challenged pursuant to Government Code section 11350. Traditional mandate pursuant to Code of Civil Procedure section 1085 was available.

*Assigned by the Chairperson of the Judicial Council.

# APPENDIX

State of California

## Memorandum

July 2, 1981

Telephone: ATSS ( )
( )

All Intake and Court Services Section Staff

William Price,
Section Administrator

Directive No.2 – Screening of Adult Court
Commitments Over Age 18

Effective immediately, all commitments from criminal court where the person was over the age of 18 at the time of the offense, will be screened in accordance with the attached policy and procedure.

The Department's goal is to bring total institutional population back to budgeted capacity of 5,340 cases by March 31, 1982. In order to achieve this reduction, we have been advised by Information Systems that, based on prior experience, we will have to reject approximately 50% of the criminal court commitments who were over the age of 18 at the time of the offense.

As you know, we did pilot tests of this procedure for setting "Level of Criminality". The first test, from April 27, 1981 to May 12, 1981, resulted in mock scores for 128 cases. The second pilot test, from June 17, 1981 to June 30, 1981 resulted in 100 cases. The median value score that resulted from these tests was a cut-off at 12 points.

In screening these commitments, then, a score of 12 points will be used as the maximum for acceptance. Scores of 13 points and above will be rejected unless I approve an override decision for unusual cases. Exceptions must be kept to a minimum.

As we develop more experience with this procedure, the cut-off score may be adjusted upward or downward. It is my intent to try to keep such adjustments to a minimum.

Rejection based on "no adequate facilities" will be communicated to the courts using the attached sample letter format.

William Price, Administrator
Intake and Court Services Section

WP:rem
attachment

# Memorandum

All Intake and Court Services Section Staff Date : July 20, 1981

Subject: Directive No. 3-
Amended Policy in Screening
Adult Court Commitments
Over Age 18

William Price, Administrator
Intake and Court Services Section

Effective immediately, based on instructions from the Branch Deputy
Director's office, the screening cut-off for "Level of Criminality"
is reduced by one point. Eleven points is now the maximum for acceptance.

William Price
William Price, Administrator
Intake and Court Services Section

WP:rem

**606**

DEPARTMENT OF YOUTH AUTHORITY
 4241 Williamsbourgh Drive
 Sacramento, CA 95823

June 22, 1981

Dear

The Department of the Youth Authority administers eight institutions, six
forestry camps, and two reception centers. These facilities have a program
capacity for 5,340 young people who are committed by the juvenile and criminal
courts. Currently they are overcrowded by nearly 400, and if current commit-
ment trends continue, we will soon be 500 institutional cases over capacity.
Obviously, this poses a very serious safety and security problem, and mili-
tates against providing needed training and treatment services.

Sections 736 and 1731.5 of the Welfare and Institutions Code require that the
Youth Authority accept persons committed to it "...if it believes that the
person can be materially benefited by its reformatory and educational disci-
pline, and if it has adequate facilities to provide such care" (emphasis
added). In the past, our intake decisions have been based upon provisions
defining material benefit. Until now it has not been necessary to consider
the availability of institution space when making intake decisions; i.e.,
adequate facilities. Regrettably, now we find it necessary to reduce the
number of institution admissions so that the Department can assure the avail-
ability of safe, secure, and adequate facilities within which to fulfill our
mandates.

The Youth Authority is a placement of last resort for persons committed by
juvenile courts. Presumably there are no other viable local disposition
alternatives for such persons. For that reason, acceptance priority will be
given to juvenile cases, assuming that commitment rates for such persons
remain about the same as at present.

Institution space will also be used for persons committed by criminal courts
who display lower levels of criminality. This judgment will be based on an
evaluation of such factors as commitment behavior, prior record (escalation
and magnitude), criminal sophistication, and number of prior secure program
placements. We will begin screening new criminal court commitments for their

-2-

level of criminality commencing July 1, 1981. The resulting gradual reduction in intake of criminal court cases will continue only as long as the current overcrowding makes it necessary. This reduction in intake will apply to criminal court cases that were 18 years of age or older at the time of the commission of the crime.

If you have any questions concerning this policy, please contact me. Also, please feel free to call our Case Services Division in Sacramento, (916) 445-3803, regarding the application of the criteria to individual cases.

Sincerely,

Pearl S. West, Director
(916) 445-2561

cc: Presiding Judges of the Criminal Courts
Presiding Judges of the Juvenile Courts
District Attorneys
Public Defenders
Chief Probation Officers

Department of the Youth Authority

SCREENING OF CRIMINAL COURT COMMITMENTS

By statute, the Department is required to "... accept a person committed to
it... if it believes that the person can be *materially benefited* by its
reformatory and educational discipline, and if it has *adequate facilities* to
provide such care." (Sections 736 and 1731.5, Welfare and Institutions Code.)

Intake decisions are to be made sequentially. First a judgment is made concerning
whether a committed youth can be *materially benefited* (15 California Adminis-
trative Code 4168). Some cases are rejected at this point. After it is
decided that the youth will *materially benefit*, a decision is to be made
concerning the availability of *adequate facilities* for that person. This
judgment is to be based upon whether unoccupied, budgeted institution space is
needed more for other persons awaiting acceptance action at the same time
based upon the level of their criminality.

The attached form and factor descriptions will be used to assess the level of
each person's criminality. A total value score is derived by adding the indi-
vidual scores assigned to each factor; e.g. commitment behavior, etc. The
Intake and Court Services Section will be advised of how many cases may be
accepted upon commitment from the criminal courts. Using this information,
a cutoff point will be fixed on the value scale continuum. Cases assigned
scores above that point will be rejected because *adequate facilities* are not
available. An exception may be made in individual cases for unusual reasons.

This policy shall only apply to the processing of adult court commitments to
the Youth Authority where the person was over the age of 18 years at the time
of the offense.

Criminal Court Commitment
LEVEL OF CRIMINALITY

Name _____ DOB: _____ County _____

Value

1. Commitment Behavior
 (Take confinement time from court order: 1 year = 1 point) _____

2. Offense Pattern - Magnitude
 (Total mid-terms from Penal Code for all prior sustained
 offenses: 1 year = 1 point) _____

3. Offense Pattern - Escalation
 (See description) _____

 | | |
 |---|---|
 | High | 3 points |
 | Moderate | 2 points |
 | Limited | 1 point |
 | None | 0 points |
 | De-escalation | -1 point |

4. Criminal Sophistication/Orientation
 (See description) _____

 | | |
 |---|---|
 | High | 3 points |
 | Moderate | 2 points |
 | Limited | 1 point |

5. Prior Secure Program Placements
 (See description) _____

 | | |
 |---|---|
 | State level | 5 points |
 | Two or more local | 3 points |
 | One local | 2 points |
 | None | 0 points |

TOTAL VALUE SCORE _____

Date:_____
Remand_____
Accept_____
Reject_____ Intake Consultant

## COMMITMENT BEHAVIOR

An indication of the significance of commitment behavior is drawn from the total authorized confinement time fixed by court order. It reflects the weight or significance that this behavior is assigned by public policy.

| Alternative Ratings | Selection Factors |
|---|---|
| One year of authorized confinement time will be assigned one point. | Use commitment order from the court. |

## OFFENSE PATTERN - MAGNITUDE

Magnitude of prior offense history is an indication of the relative weight or significance of a person's criminality, cumulatively since the first sustained offense.

| Alternative Ratings | Selection Factors |
|---|---|
| Total the Penal Code confinement time mid-terms for all prior sustained offenses. Do not include enhancements, behavior credit and credit for time in custody. Show full mid-term for subordinate offenses. | Use official records and the Penal Code (current edition.) |

One year of confinement equals one point.

## OFFENSE PATTERN - ESCALATION

This category describes the "quality" of a person's delinquent behavior. It is designed to differentiate between persons who are on their way to becoming a career-criminal from those whose offenses are situational, sporadic, and non-patterned. It also accounts for the persons who are gradually "outgrowing" their criminal behavior, thus improving the likelihood of eventually becoming non-offenders.

The characteristics included in each section are guidelines for making evaluations; not _every_ single description has to be met to satisfy a given rating.

| Alternative Ratings | Selection Factors |
|---|---|
| Serious/High (3 points): Offense history at least of three years duration; earlier minor offenses, followed by serious offenses, including violence; arrest-free time in the community decreasing fairly steadily. | 1. Characteristics of offenses.<br><br>2. Amount of violence in arrest history.<br><br>3. Duration of arrest history. |
| Moderate (2 points): Offense history of at least two years duration; earlier minor offenses followed by non-violent serious offenses; arrest-free time in the community decreasing fairly steadily. If offense history is less than two years duration, the escalation is very pronounced, including violence. | 4. Amount of arrest-free time in community.<br><br>5. Social background information. |
| Limited (1 point): Multiple offenses, spread over the past year; level of seriousness not changing markedly; may involve some less serious violence; some triggering event appears a likely cause of criminal behavior. | |
| None (0 points): A single serious offense or several offenses spread over a short time span ("crime spree" behavior); behavior shows no discernible pattern over time. | |

De-Escalation (-1 point): More serious
offenses followed by less serious ones;
no recent violence; social information
indicates person is maturing and can
clearly profit from rehabilitative
program.

## SOPHISTICATION/ORIENTATION

Level of Sophistication/Orientation means the degree to which persons have
moved into a fully-committed criminal lifestyle as compared to the lifestyle
of average, law-abiding citizens. It is unrelated to age or seriousness of
single offenses.

### Alternative Ratings

High ( 3 points): Persons have a dis-
respect for law and the justice system;
use intimidation to manipulate others;
identify with delinquent peers; direct/
play delinquent institutions games; may
be a "victimizer"; criminal "know-how";
delinquent gang involvement; have a
delinquent lifestyle; and may have a
long offense history.

Moderate (2 points): Persons who have
limited or sporadic delinquent gang
involvement; are not readily intimidated;
have ability to cope with negative
institution games but are not leaders or
enforcers; ambivalent about being involved
in crime; and may have had a moderate
offense history.

Limited (1 point): Persons who have not
adopted a delinquent lifestyle; little
identification with delinquent subculture;
may be a victim of institution games;
limited ability to handle institution
lifestyle; and may have had a limited
offense history.

### Selection Factors

Make Casework Judgment. Consider the
following:

(1) Delinquent gang involvement

(2) Negative peer identification

(3) Orientation to institution negative
 delinquent subculture

(4) Attitude toward criminal justice
 system.

(5) Degree of delinquent lifestyle
 identification

(6) Degree of delinquent self-concept

(7) Delinquent orientation of family

(8) May also consider: (a) number of
 prior offenses, (b) type and
 circumstances of offenses, and (c)
 motivation or intent when committing
 crime.

## PRIOR SECURE PROGRAM PLACEMENT

One indication of a person's level of criminality is the extent to which secure
program placements have been tried is an indicator of a person's motivation
to change, tractability and overall criminality.

A prior "secure program placement" is a court-ordered placement in a public
facility for correctional program reasons (not pre-disposition confinement);
e.g. county camp or home, juvenile hall, jail, etc. It also includes placements
in Youth Authority institutions.

### Alternative Ratings

Prior state - level commitment (s):
5 points

Two or more prior secure local
program placements: 3 points

One prior secure local program
placement: 2 points

No prior secure program placements:
0 points

### Selection Factors

Use official records; e.g. court
orders, probation reports, Youth
Authority documents, etc.

| SCORE | Pre Test 4/27 to 5/12 | Pre Test 6/17 to 6/30 | TOTAL |
|-------|-----------------------|-----------------------|-------|
| 1.4 | 1 | 0 | 1 |
| 2 | 1 | 1 | 2 |
| 3 | 6 | 2 | 8 |
| 4 | 7 | 4 | 11 |
| 5 | 6 | 5 | 11 |
| 6 | 4 | 8 | 12 |
| 7 | 3 | 4 | 7 |
| 8 | 4 | 3 | 7 |
| 9 | 4 | 5 | 9 |
| 10 | 2 | 8 | 10 |
| 11 | 3 | 6 | 9 |
| 12 | 12 | 6 | 18 |
| 13 | 9 | 10 | 19 |
| 14 | 11 | 6 | 17 |
| 15 | 6 | 2 | 8 |
| 16 | 4 | 10 | 14 |
| 17 | 3 | 2 | 5 |
| 18 | 6 | 5 | 11 |
| 19 | 5 | 2 | 7 |
| 20 | 2 | 6 | 8 |
| 21 | 1 | 3 | 4 |
| 22 | 6 | 0 | 6 |
| 23 | 4 | 0 | 4 |
| 24 | 2 | 1 | 3 |
| 25+ | 16 | 1 | 17 |
| | Cut Off (median) score 13 | Cut Off (median) score 12 | Cut Off (median) score 12 |

STATE OF CALIFORNIA—YOUTH AND ADULT CORRECTIONAL AGENCY EDMUND G BROWN JR., Governor

## DEPARTMENT OF YOUTH AUTHORITY

SAMPLE REJECTION LETTER

Dear Judge_____:

Re: _____

On _____(date)_____, the court committed _____(name)_____ to the Youth Authority. We have received and reviewed the commitment documents and other pertinent information.

Section 1731.5 of the Welfare and Institutions Code.provides that the Youth Authority shall accept a person committed to it if it believes the person can be materially benefited by its reformatory and educational discipline "and if it has adequate facilities to provide such care". (Emphasis added) Determinations that necessary facilities are available will be based on: (1) the availability of unoccupied, budgeted institution space at the time it is expected that the committed person would be delivered if accepted, and (2) whether the unoccupied institution space will be needed more by other persons awaiting acceptance action at the same time based upon their level of criminality.

At the present time the Youth Authority's institution population substantially exceeds budgeted space. This overcrowding is expected to continue to the time _____(name)_____ would likely be delivered, if accepted.

(REVIEW CASE - state commitment offense, prior sustained petitions/convictions, offense pattern/escalation, criminal sophistication/orientation and number of prior severe placements.)

We have concluded that _____(name)_____ 's level of criminality is such that any bed space which becomes available in the foreseeable future will be needed more by other young people who are committed to the Youth Authority. Therefore, we are unable to accept this case. The court documents and case materials are being returned to the probation department.

If you have any questions or need further information on this case, please contact _____(name)_____, Consultant, Intake and Court Services Section, at the above address. Telephone (916) 445-3803.

Sincerely,

Pearl S. West, Director

Thomas A. McGee, Chief
Case Services Division
(916) 322-9761

4241 Williamsbourgh Drive
Sacramento, CA 95823

July 17, 1981

Honorable Dennis A. Caeton
Judge of the Superior Court
County of Fresno
P.O. Box 1628
Fresno, California 93721

Dear Judge Caeton:

Re: Frank Lupe Rocha
Court No. 269429-7
DOB: 9/17/62

On July 7, 1981, the court committed Frank Lupe Rocha to the Youth Authority.
We have received and reviewed the commitment documents and other pertinent
information.

Section 1731.5 of the Welfare and Institutions Code requires that the Youth
Authority shall accept a person committed to it if it believes the person can
be materially benefited by its reformatory and educational discipline "and if
it has adequate facilities to provide such care" (emphasis added). Determina-
tions that necessary facilities are available will be based on (1) the avail-
ability of unoccupied, budgeted institution space at the time it is expected
that the committed person would be delivered if accepted, and (2) whether the
unoccupied institution space will be needed more by other persons awaiting
acceptance action at the same time based upon their level of criminality.

At the present time the Youth Authority's institution population substantially
exceeds budgeted space. This overcrowding is expected to continue to the time
Frank Lupe Rocha would likely be delivered, if accepted.

Mr. Rocha has been committed to the Youth Authority for violation of Section 245a,
Penal Code, assault with a deadly weapon. He was committed for the upper term.
His prior record as a juvenile is lengthy, consisting mostly of sniffing intoxi-
cants and committing property offenses. He has been a gang member for a number
of years. His unlawful behavior is now escalating in seriousness. His criminal
sophistication and orientation is established by his gang membership, criminal
offenses and current violence. He has had a number of secure placements at the
county level.

We have concluded that Frank Lupe Rocha's level of criminality is such that any
bed space which becomes available in the foreseeable future will be needed more
by other young people who are committed to the Youth Authority. Therefore, we
are unable to accept this case. The court documents and case materials are
being returned to the probation department.

Judge Dennis A. Caeton -2- July 17, 1981

If you have any questions or need further information on this case, please contact Robert L. Mayse, Consultant, Intake and Court Services Section, at the above address. Telephone (916) 445-3803.

Sincerely,

Pearl S. West, Director

William Price, Administrator
Intake and Court Services Section
(916) 445-3803

RLM:jmh

cc: Court Clerk
 Probation Department
 Sheriff

bcc: Pearl S. West, Director