[No. A031334. First Dist., Div. Three. Sept. 25, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
JEFFREY WINDHAM et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts V and VIII.

## COUNSEL

James A. Sibley and Charles Gretsch, under appointments by the Court of Appeal, for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Dane R. Gillette and Christopher W. Grove, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MERRILL, J.**—An amended information was filed charging appellants Jeffrey Windham and Carl Wilson with robbery (Pen. Code,[1] § 211) in count one and with receiving, concealing and withholding stolen property (§ 496, subd. 1) in count two. In addition, Wilson was charged with possession of a sawed-off shotgun (§ 12020) in count three and Windham was charged with vehicle theft (Veh. Code, § 10851) in count four. The amended information also contained the following enhancement allegations: that Wilson used a rifle in the commission of the robbery (§ 12022.5) and that Windham was armed with a rifle in the commission of the robbery (§ 12022, subd. (a)). Appellants entered not guilty pleas and denied the arming and use allegations.

A motion to sever was granted as to the possession of a sawed-off shotgun charge in count three and Wilson was found guilty in a subsequent court trial on this bifurcated count.

The jury found Wilson and Windham guilty of the robbery charge in count one, and that the use allegation as to Wilson and the arming allegation as to Windham were true. Windham was also found guilty of the vehicle theft charge in count four. Both appellants were found not guilty of the receiving, concealing and withholding stolen property charge in count two. The jury had been instructed by the trial court that the crimes charged in counts one and two were in the alternative, and, accordingly, if a defendant was guilty of one of these offenses he must be found not guilty of the other.

---

[1] Unless otherwise indicated, all further statutory references are to the Penal Code.

Wilson was sentenced to state prison for the midterm of three years on the robbery count, for a concurrent midterm of two years on the possession of a sawed-off shotgun count and for a consecutive two-year term on the firearm-use enhancement. He was ordered housed in the California Youth Authority (CYA) pursuant to Welfare and Institutions Code section 1731.5, subdivision (c).[2] However, the CYA declined to accept him. The trial court then committed him to state prison for the five-year term.

Windham was sentenced to the midterm of three years on the robbery count, to a consecutive term of eight months on the vehicle theft count and to a consecutive one-year term on the arming enhancement. Windham was committed to the CYA for a total of four years and eight months. Both Windham and Wilson appeal.

## I

On December 17, 1984, at approximately 7 a.m., William Lee was standing at the bus stop at the corner of Baker and Turk Streets in San Francisco, waiting for a bus. He was alone. The sun had not completely risen and the street lights were still on. Lee noticed a man, later identified as Windham, walking toward him from the corner. Windham then motioned to a second man, later identified as Wilson, to approach. Both appellants confronted Lee. Wilson, standing directly in front of Lee, held a sawed-off rifle one foot away from him and pointed it directly at his face. Windham, also facing Lee, commanded: "Let me have it." Lee, in shock, did not respond immediately. Windham then said: "You want me to wait all day?" Wilson cocked the rifle and aimed it directly at Lee's temple as Lee handed his wallet to Windham. Appellants then crossed in front of Lee and walked away quickly. Lee testified that although he was frightened, he tried to remain calm and to "take a good look" at the perpetrators. His reddish-brown eelskin wallet contained his social security card, driver's license and credit cards and $50 in cash.

Lee went home, telephoned the police and provided an account of the crime to the officer who responded to his home. He then boarded a bus to

---

[2] Welfare and Institutions Code section 1731.5, subdivision (c), provides in pertinent part: "Any person under the age of 21 years who is not committed to the authority pursuant to this section may be transferred to the authority by the Director of Corrections with the approval of the Director of the Youth Authority. In sentencing a person under the age of 21 years, the court may order that the person shall be transferred to the custody of the Youth Authority pursuant to this subdivision. When the court makes such an order and the Youth Authority fails to accept custody of the person, the person shall be returned to court for resentencing. The transfer shall be solely for the purposes of housing the inmate and allowing participation in the programs available at the institution by the inmate, who, in all other aspects shall be deemed to be committed to the Department of Corrections and shall remain subject to the jurisdiction of the Director of Corrections and the Board of Prison Terms."

go to work. Four or five stops after his Baker Street stop, Lee observed Windham and Wilson board the same bus. Wilson stood next to Windham who was seated. They were three seats in front of Lee. They remained on the bus seven or eight minutes until they got off at the Emporium department store on Market Street. Lee reported this second observation to a police officer at the Hall of Justice juvenile section.

At 6:15 p.m. on December 19, 1984, Beverly Ayatch parked and locked her 1976 Datsun automobile on the 1200 block of Broderick Street in San Francisco. She visited her mother-in-law until sometime around 10 p.m. that evening and returned to the location where the car was parked only to find that it was gone. She noticed shattered glass on the ground directly below where the left rear window of her car had been.

At 11:30 p.m. the same evening, Sergeant Joseph Allegro of the San Francisco Police Department noticed a Datsun automobile stopped in front of the Kentucky Fried Chicken driveway at 681 Eddy Street; the car lights were on, the motor was running, there was no one in the driver's seat, and there was one passenger, Wilson, in the right front seat. There were no other automobiles or pedestrians in the immediate area. The only person nearby was Windham who was in a telephone booth just across the sidewalk from the Datsun. Sergeant Allegro checked the "hot sheet" which lists the license numbers of stolen vehicles and the Datsun's license number was on the list.

Sergeant Allegro radioed for assistance and additional officers responded to the scene within 30 seconds. They approached the vehicle and told Wilson to place his hands in the air. At the same time, they observed Dennis W. in the back seat of the Datsun. Windham, Wilson and Williams[3] were all placed under arrest. The officers noticed that the left rear window was broken and a piece of metal rather than a key was in the ignition. A backpack found in the Datsun contained, among other things, a flashlight and pliers which are items commonly used in vehicle theft. Beverly Ayatch subsequently identified the Datsun as her vehicle.

The three were taken to the police station, booked and searched. Lee's social security card was found in Wilson's wallet. Lee's eelskin wallet was found in Windham's possession. It was discovered that both appellants were wearing two layers of clothing, i.e., two pairs of pants, and two jackets. The officer who conducted the booking search testified that perpetrators of crimes often attempt to conceal their identity by removing an outer layer of clothing.

---

[3] Dennis W., a juvenile, was not tried in this proceeding.

Lee was shown two photographic lineups on December 20, 1984, each containing six photographs. From one of these spreads he identified Wilson as the robber who held the rifle to his head. He also picked out Windham's photograph from the second photographic lineup as the other robber. However, he did not place his signature on it as he was only 98 percent certain of his identification of Windham.

At a subsequent corporeal lineup, Lee positively identified Wilson from one group of six men. Again, he placed a question mark on his identification with reference to Windham as he was only 98 percent certain. Lee identified both appellants at trial as the robbers.

Testifying in his own defense, Windham denied committing the robbery or stealing the automobile. He stated that on the evening of December 19, 1984, after watching television at the home of his girlfriend, some time around 11 p.m., he took the bus to the Kentucky Fried Chicken store at the corner of Polk and Eddy Streets, to buy dinner. When he realized the store was closed, he used the nearby public telephone to ask her whether she wanted something else to eat. At this point he was arrested.

Windham stated that he was acquainted with Wilson but only as the two had played football together. He testified that he had seen Wilson 10 times in the 2 months prior to his arrest but he did not know his name. During the 10 minutes he was talking to his girlfriend, Windham did not notice that Wilson was sitting in the nearby car. Windham also testified that he did not know the juvenile, Dennis W. In addition, Windham denied that Lee's eelskin wallet was found in his possession.

Wilson also denied involvement in the robbery. As to the evening of December 19, 1984, Wilson admitted being in the Datsun but denied any knowledge that it was stolen. Wilson stated that he and Dennis W. were passengers and that another individual named Frank was the driver. They had stopped on Eddy Street for Frank to purchase chicken. However, discovering that the Kentucky Fried Chicken store was closed, Frank then went to visit "his woman" at the motel across the street. Wilson testified that Frank must have inadvertently left the lights on and the motor running when he got out of the car. Wilson did not know Frank's last name or address. Wilson also denied that Windham had been in the car that evening and claimed not to have seen him until after they were arrested. Wilson denied ever seeing Lee's social security card and stated that at the time of the booking search, the officers mixed up his property with that of other persons.

## II

*Windham's appeal*

Prior to the filing of the amended information in this case, Windham, pursuant to section 1538.5, moved unsuccessfully to suppress all evidence obtained as a result of his allegedly illegal arrest. The motion was submitted on the basis of the preliminary hearing transcript. ▪ In his motion and on appeal he argues that probable cause for his arrest did not exist. We disagree.

▪ " 'Cause for arrest exists when the facts known to the arresting officer "would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime." [Citations.]' " (*People* v. *Superior Court (Wells)* (1980) 27 Cal.3d 670, 674 [165 Cal.Rptr. 872, 612 P.2d 962], quoting *People* v. *Harris* (1975) 15 Cal.3d 384, 389 [124 Cal.Rptr. 536, 540 P.2d 632], cert. den. *sub. nom. California* v. *Harris* (1976) 425 U.S. 934 [48 L.Ed.2d 175, 96 S.Ct. 1664].) Each case must be decided on the particular facts and circumstances presented therein. (*People* v. *Superior Court (Keifer)* (1970) 3 Cal.3d 807, 827 [91 Cal.Rptr. 729, 478 P.2d 449, 45 A.L.R.3d 559].) ▪ The issue presented here is whether Sergeant Allegro, as a person of ordinary care and prudence, would be led by the facts apparent to him to entertain an honest and strong suspicion that Windham committed a crime.

The preliminary hearing transcript demonstrates that Sergeant Allegro objectively and subjectively entertained an honest and strong suspicion of Windham's involvement in a crime. Prior to the arrest, the officer knew that the license plate number on the Datsun was listed on his hot sheet as a stolen vehicle. The time was 11:30 p.m., and no one else was in the area. The vehicle was stopped but the lights were on and the motor was running. The officer observed one man in the vehicle, sitting in the right front passenger seat and another man approximately 15 to 20 feet away using a public telephone.

▪ Furthermore, we are bound to consider this record in light of the well-established standard of review, that on appeal from a section 1538.5 ruling, an appellate court must draw all presumptions in favor of the factual determinations of the superior court and uphold the superior court's express and implied findings of fact if they are supported by substantial evidence. (See *People* v. *Laiwa* (1983) 34 Cal.3d 711, 718 [195 Cal.Rptr. 503, 669 P.2d 1278], citing *People* v. *Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621].) ▪ Accordingly, the superior court's finding of probable cause to arrest should be upheld. There is substantial evidence to support the express finding of probable cause to arrest Wind-

ham. The facts and circumstances known to Sergeant Allegro support his conclusion that Windham was the driver of the vehicle reported to be involved in a felony.

### III

Windham's second contention on appeal is that there is insufficient evidence to support his conviction on count four, the violation of Vehicle Code section 10851. There is no merit in this argument.

The elements necessary to establish a violation of section 10851 of the Vehicle Code are the defendant's driving or taking of a vehicle belonging to another person, without the owner's consent, and with specific intent to permanently or temporarily deprive the owner of title or possession. (Veh. Code, § 10851, subd. (a); *People* v. *Pater* (1968) 267 Cal.App.2d 921, 923-924 [73 Cal.Rptr. 823].)

"Once the unlawful taking of the vehicle has been established, possession of the recently taken vehicle by the defendant with slight corroboration through statements or conduct tending to show guilt is sufficient to sustain a conviction of Vehicle Code section 10851. [Citations.]" (*In re Robert V.* (1982) 132 Cal.App.3d 815, 821-822 [183 Cal.Rptr. 698].) "The specific intent to deprive the owner of possession of his car may be inferred from all the facts and circumstances of the particular case. [Citations.]" (*Id.,* at p. 821.)

In a challenge to the sufficiency of the evidence to sustain a conviction, "the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].)

There clearly was substantial evidence presented at trial which would permit a reasonable jury to find Windham guilty of violating section 10851 beyond a reasonable doubt. The jury could reasonably have relied on the following evidence in finding Windham guilty: His position 15 to 20 feet away from the car, the fact that the car motor was running and its lights were on, the fact that his friend coincidentally was a passenger in the car; there was no one else in the area; the car's ignition had been jammed with a metal piece, its left rear window was shattered, the trunk lock was missing and the license plate on the car had been stolen from another car; he was found with a Datsun automobile key in his possession; and he was arrested only an hour and one-half after the car was stolen. Together such evidence

demonstrated that Windham was the driver of Beverly Ayatch's vehicle and that he had the intent to deprive her of possession. There was sufficient evidence to support his Vehicle Code section 10851 conviction.

## IV

Prior to trial the court denied Windham's motion to sever the robbery count from the counts for receiving, concealing and withholding stolen property, and vehicle theft. On appeal, Windham contends that the robbery count and the vehicle theft count were impermissibly joined in the first instance.[4] In addition, he urges that even if joinder was statutorily permissible, the trial court should have severed the counts to prevent prejudice. We do not agree.

Section 954 provides in pertinent part that "two or more different offenses connected together in their commission" may be consolidated for trial. However the court, "in the interests of justice and for good cause shown, may in its discretion order that the different offenses . . . be tried separately . . . ."

Offenses committed at different times and places against different victims may nevertheless be " 'connected together in their commission' " when there is a " 'common element of substantial importance' " among them. (*People* v. *Matson* (1974) 13 Cal.3d 35, 39 [117 Cal.Rptr. 664, 528 P.2d 752].) Joinder may be proper where the element of intent to feloniously obtain property is common to the various offenses. (*People* v. *Chessman* (1959) 52 Cal.2d 467, 492 [341 P.2d 679], cert. den. *sub nom. Chessman* v. *California* (1959) 361 U.S. 925 [4 L.Ed.2d 241, 80 S.Ct. 296] and disapproved on another point in *People* v. *Morse* (1964) 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810].)

In *People* v. *Chessman, supra,* 52 Cal.2d at pages 491-492, our Supreme Court held that the trial court properly consolidated the 17 felony counts for trial. The stolen car involved in the offense of grand theft of an automobile was used in the perpetration of 11 counts concerning robberies, kidnappings and sex offenses committed in connection with some of the robberies. The remaining five counts, store robberies and related kidnappings, were of the same "class" of crimes as the other robberies and kidnappings. The Supreme Court found "the element of intent to feloniously obtain property

---

[4]On appeal, Windham seems to overlook the fact that when the trial court ruled upon the motion to sever, and at trial, the count for receiving, concealing and withholding stolen property was also before the court, and this count was linked to both the robbery count and the vehicle theft count. A discerning trial judge quickly grasped the various factors connecting all these counts, and her understanding of her discretionary powers is evidenced by the severance of the count for possession of a sawed-off shotgun.

runs like a single thread through the various offenses . . . ." (*Id.,* at pp. 473-474, 492.)

Also, in *People v. Scott* (1944) 24 Cal.2d 774, 779 [151 P.2d 517], our Supreme Court found the joinder of a rape charge with an offense charged under the Dangerous Weapons' Control Law of 1923 to be proper. The court reasoned that possession of the firearm intimidated the rape victim and therefore was an element of the rape. Possession of the firearm was also the basis of the weapons charge. The court concluded that possession of the firearm was an important common element of both crimes.

 Similarly, in the case at bench, the intent to feloniously obtain property is common to all three offenses. Furthermore, the items taken in the robbery, Lee's wallet, social security card, driver's license and credit cards, also provide a common element of substantial importance which connects the offenses together in their commission. The stolen items were the basis of the robbery charge and the receiving, concealing and withholding stolen property charge. Further, these stolen items were recovered in the course of Windham's arrest for the auto theft. During the commission of the auto theft, appellants were in the act of withholding and concealing the items taken in the robbery. There is no error presented by the joinder of these three counts.

 Even though joinder is permitted pursuant to section 954, severance of the offenses may be required if the defendant can clearly establish prejudice resulting from the joinder. (*Williams v. Superior Court* (1984) 36 Cal.3d 441, 447 [204 Cal.Rptr. 700, 683 P.2d 699].) The denial of a motion to sever may be prejudicial error if the trial court's discretionary powers pursuant to section 954 have been abused. (*Ibid.*) The burden of demonstrating that the denial of severance was a prejudicial abuse of discretion falls upon the appellant; prejudice must be proved and " '[a] bald assertion of prejudice is not enough.' " (*People v. Balderas* (1985) 41 Cal.3d 144, 171 [222 Cal.Rptr. 184, 711 P.2d 480], quoting *People v. Kemp* (1961) 55 Cal.2d 458, 477 [11 Cal.Rptr. 361, 359 P.2d 913], cert. den. *sub nom. Kemp v. California* (1961) 368 U.S. 932 [7 L.Ed.2d 194, 82 S.Ct. 359].) Moreover, motions for severance must be reviewed in light of the showings then made and the facts then known. (*People v. Balderas, supra,* 41 Cal.3d at p. 171.)

The first step in reviewing a severance motion is to examine the issue of cross-admissibility of evidence. As cross-admissibility would ordinarily dispel any possibility of prejudice, we must ask "had the severance motion been granted, would the evidence pertinent to one case have been admissible in the other under the rules of evidence which limit the use of character

evidence or prior similar acts to prove conduct." (*Williams* v. *Superior Court, supra,* 36 Cal.3d at p. 448, fn. omitted.)

■ Cross-admissibility of evidence is clearly presented. The evidentiary rules limiting character evidence or prior similar acts are not the pertinent questions here. Instead, we are concerned in this case with the admissibility of physical evidence and testimony linking the three counts. The evidence found on appellants during their arrest for auto theft were among the items taken from Lee during the robbery. Windham had Lee's eelskin wallet in his possession and Wilson had Lee's social security card in his possession. Such evidence would have been admissible in a separate trial on the robbery charge to show appellants' possession of the stolen items and to establish their involvement in the robbery. It would also be relevant in such a trial to show that appellants were friends, and their involvement together in the vehicle theft and concealing the stolen property would be evidence of this fact. Likewise, the fact that both appellants were found in possession of the robbery items on the evening of their arrest would have been admissible in a separate vehicle theft trial to establish that the two men were more than casual acquaintances as claimed by Windham, and that their close proximity to each other on Polk Street that evening was more than coincidence, thus raising the inference that Windham was the driver of the stolen car.

Further, in a separate trial on the charge of receiving, concealing and withholding stolen property, evidence of what was taken in the robbery would certainly be admissible to prove that the items found on appellants were stolen.

Additionally, evidence of their arrest on the vehicle theft charge would have been admissible in both a separate trial on the charge of receiving, concealing and withholding stolen property and the charge of robbery. Both appellants denied that the property taken from Lee was ever in their possession. They claim that they were required to place their belongings on the booking counter and the stolen property became commingled with their property. Thus, the challenge to the chain of possession was the crux of their defense and testimony as to the circumstances surrounding appellants' arrest and booking would have been admitted to demonstrate that the stolen items were found on their persons.

To the extent there was any lack of cross-admissibility on the consolidated charges, it does not demonstrate that the denial of severance was error. ■ A trial court's discretion in denying severance is broader than the degree of discretion in admitting evidence of uncharged offenses. " '[A] ruling on a motion to sever is based on a weighing of the probative value as against the prejudicial effect, but in the weighing process the beneficial results from joinder are added to the probative-value side. This requires the

defendant to make an even stronger showing of prejudicial effect than would be required in determining whether to admit other-crimes evidence in a severed trial.'" (*People* v. *Balderas, supra,* 41 Cal.3d at p. 173, quoting *People* v. *Williams, supra,* 36 Cal.3d at p. 451.) The court should consider whether there is a joinder of a "weak" case with a "strong" case or another "weak" case, so that the "spillover" effect of aggregate evidence on several charges might well alter the outcome on some or all. (See *People* v. *Balderas, supra,* 41 Cal.3d at p. 173.)

■ It is apparent that if the instant cases had been tried separately, each of the cases were sufficiently strong in their own right to negate the possibility that in a consolidated trial the spillover effect from a particular charge would alter the outcome of any other charge. As to the robbery charge, Lee's identification of appellants and recollection of the incident sufficiently demonstrated their guilt on such count. The officers' testimony as to Windham's possession of Lee's wallet and Wilson's possession of Lee's social security card was strong evidence on both the counts of robbery and receiving, concealing and withholding stolen property. With reference to the vehicle theft charge, there was overwhelming evidence that Windham was the driver of the stolen car.

During the proceedings below, Windham failed to make any showing of specific prejudice to him which might result from a joint trial. In fact, Windham's counsel stated that his "main prejudice problem" would be solved by severance of count three, the possession of sawed-off shotgun charge, from the remaining counts. That charge was severed from the others. Furthermore, although not a deciding factor, substantial judicial benefit resulted from joinder as there would have been a considerable duplication of evidence in separate trials.

In view of the lack of prejudice, the high degree of discretion, and the beneficial judicial results of joinder, Windham has not met his burden of demonstrating error by the denial of his severance motion.

V*

. . . . . . . . . . . . . . . . . . . .

VI

*Wilson's appeal*

■ Wilson's first challenge to his judgment of conviction is that the prosecutor's failure to identify a material witness warrants reversal.

---

*Part V of this opinion is not certified for publication. (See fn., *ante*, p. 1580.)

However, the import of the decisions on this question do not support Wilson's argument. Reversible error is not shown.

Wilson contends that due process was denied him by the prosecutor's failure to investigate and learn the name of the police officer to whom Lee reported his sighting of appellants on the bus. It is Wilson's position that, had he known the officer's name, he could have subpoenaed the officer and possibly attacked the credibility of Lee's identification testimony. Wilson maintains the name of the officer was material evidence. It appears from the record that until the preliminary hearing in this case, the prosecutor and his investigator had no knowledge that Lee had made a second observation of appellants. Immediately after the hearing, Lee advised the prosecutor and inspector of this observation and such fact was noted in the inspector's chronological notes. Defense counsel received complete discovery of these notes. On the morning of the first day of trial, Lee advised the prosecutor that after the bus incident he went to the juvenile bureau and reported it to an investigator. Lee could not remember the name of the investigator. The trial court denied appellant's motion for mistrial made on the basis of the prosecutor's failure to discover and inform defense counsel of the juvenile inspector's name. During Lee's testimony on the second day of trial, the juvenile inspector's name was learned for the first time.

■■■ Our Supreme Court has imposed upon prosecutors the duty to disclose substantial material evidence favorable to the accused without request. This duty applies to evidence concerning the credibility of prosecution witnesses. (*People* v. *Wright* (1985) 39 Cal.3d 576, 590 [217 Cal.Rptr. 212, 703 P.2d 1106], citing *People* v. *Ruthford* (1975) 14 Cal.3d 399, 405-406 [121 Cal.Rptr. 261, 534 P.2d 1341]; see also *People* v. *Nation* (1980) 26 Cal.3d 169, 175-176 [161 Cal.Rptr. 299, 604 P.2d 1051].) However, there is no obligation upon the People to " 'gather up everything which might eventually prove useful to the defense.' " (*People* v. *Hogan* (1982) 31 Cal.3d 815, 851 [183 Cal.Rptr. 817, 647 P.2d 93], quoting *People* v. *Watson* (1977) 75 Cal.App.3d 384, 400 [142 Cal.Rptr. 134]; *People* v. *Harris* (1985) 165 Cal.App.3d 324, 329 [211 Cal.Rptr. 493].) The law does not require law enforcement agencies to " 'take the initiative, or even any affirmative action, in procuring the evidence deemed necessary to the defense of an accused.' " (*People* v. *Newsome* (1982) 136 Cal.App.3d 992, 1006 [186 Cal.Rptr. 676], quoting *In re Koehne* (1960) 54 Cal.2d 757, 759 [8 Cal.Rptr. 435, 356 P.2d 179].)

■■■ The record herein does not support the contention that Wilson's due process rights were violated. In the first instance, the prosecutor was under no duty to investigate whether Lee spoke to anyone about the bus incident and then disclose such information to defense counsel. Second, as to the prosecutor's failure to inform defense counsel of Lee's conversation

with an unnamed juvenile inspector, Wilson has failed to meet his burden of demonstrating that such evidence constituted substantial material evidence favorable to his defense. His argument that knowledge of the inspector's name may have shown Lee's testimony to be less credible is speculative and unpersuasive. In light of the consistency and strength of Lee's identification of appellants, Wilson's assertion of the materiality of this evidence is unpersuasive.

Furthermore, we observe that when all parties learned of Lee's conversation with the officer, it was only the first day of a five-day trial. On the second day, Lee recalled the officer's name.[5] Even at this point, defense counsel could have attempted to procure the testimony of the juvenile department officer or sought a continuance in order to accomplish further investigation. The fact that these steps were not taken further buttresses our conclusion that such evidence was neither substantial nor material.

## VII

We next examine Wilson's claim that his procedural due process rights under the California Constitution, article I, sections 7 and 15, were violated when the CYA rejected him without an administrative hearing. We conclude a denial of due process did not occur.

Wilson places his principal reliance upon *People* v. *Ramirez* (1979) 25 Cal.3d 260 [158 Cal.Rptr. 316, 599 P.2d 622], wherein the Supreme Court considered whether California's due process clauses entitle a patient-inmate of the California Rehabilitation Center (CRC) to procedural protection prior to his exclusion from the program and resumption of criminal proceedings. The court found that the defendant had been denied due process in the exclusion proceedings.

In *Ramirez,* the defendant had been committed to CRC because he was, or was in imminent danger of becoming, a narcotic addict. (Welf. & Inst. Code, § 3051.) Following three years of treatment, Ramirez was placed on outpatient status and was arrested for disturbing the peace two years thereafter. After pleading guilty to the charge he was found unfit for treatment at CRC by the Director of Corrections. In a superior court hearing on the propriety of the order excluding him from CRC, the trial court found no abuse of discretion. His criminal proceedings were resumed and he was sentenced to prison.

Our Supreme Court reversed, finding Ramirez had been denied procedural protections prior to his exclusion from CRC. The court adopted a balanc-

---

[5] It seems that Lee found the officer's business card at home between the first and second day of trial and brought it with him to court on the second day.

ing approach in which governmental and private interests are weighed against each other in order to determine what procedural protections are warranted to promote accurate and reliable administrative decisions and to ensure freedom from arbitrary adjudicative procedures. The following four factors were set forth as requiring consideration: "(1) the private interest that will be affected by the official action, (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards, (3) the dignitary interest in informing individuals of the nature, grounds and consequences of the action and in enabling them to present their side of the story before a responsible governmental official, and (4) the governmental interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." (25 Cal.3d at p. 269.)

In *People* v. *Rocha* (1982) 135 Cal.App.3d 590 [186 Cal.Rptr. 132], considering an issue similar to that presented here, the Court of Appeal found that an applicant for CYA commitment is not denied due process under the California Constitution when an administrative hearing is not provided prior to rejection. Applying the four factors set forth in *Ramirez,* the court found there to be a substantial private interest on the part of the CYA applicant. Second, there is only a slight risk of an erroneous decision as the CYA utilizes a "level of criminality" analysis which takes into consideration objective measures of an individual's criminality. (*People* v. *Rocha, supra,* 135 Cal.App.3d at pp. 596-598, 609-611.) The court also distinguished the CYA evaluation process from the " 'inherently subjective' factors" involved in the CRC exclusion process. While the subjectiveness of the process support the argument for the addict's participation in CRC evaluations, "the absence of [subjective factors] in the [CYA's system] lessens the chance of error and indicates no real need for the defendant's corporeal presence at the time of administrative decision." (*Id.,* at p. 598.)

As to the dignitary interest, the *Rocha* court reasoned that a defendant is afforded some opportunity for involvement in CYA procedures by his or her participation in the initial hearing on the report of the probation officer, which immediately precedes the CYA's decision. Further, the *Rocha* court distinguished the CRC termination procedure in *Ramirez* from a CYA rejection decision. The court found that although the greater sense of participation did not provide Rocha with the dignity of a hearing before the administrative agency, it was sufficient. (*People* v. *Rocha, supra,* 135 Cal.App.3d at p. 600.)

Finally, the *Rocha* court analyzed the governmental interest involved and concluded that it would be costly and burdensome to transport, process, and house individuals at CYA for the purpose of an administrative hearing.

The court found that the prospective inmate's private interest was out-weighed by the minimal risk of an erroneous decision, the fact that some dignitary interest is provided by established procedures and the substantial administrative burden. Thus, a prerejection administrative hearing with the defendant's presence is not required by due process considerations. (*People v. Rocha, supra,* 135 Cal.App.3d at p. 600.)

Likewise, application of the *Ramirez* factors to the instant case compels the conclusion that the California due process clauses do not mandate a prerejection administrative hearing.

First, although Wilson has a substantial private interest in being housed at a CYA facility, we note that his interest in such transfer is less than a defendant who may be committed to CYA.[6] Wilson's record, as a result of his conviction in the instant case, will reflect a state prison term prior, subjecting him to possible enhanced prison terms in any future prosecution. (§ 667.5.)

Second, there is virtually no risk of an erroneous decision under the particular circumstances herein. Again, we reiterate Wilson was not com-mitted to the CYA but only ordered transferred to CYA custody to serve out his state prison term pursuant to CYA's acceptance of him. (See Welf. & Inst. Code, § 1731.5, subd. (c).) The Director of CYA is authorized by statute to reject such transfer if, in his or her opinion, it "would endanger security" at the facility. (Welf. & Inst. Code, § 1714, subd. (b).) The letter refusing Wilson's transfer provided that a review of the underlying case and "our records" shows that Wilson "poses a serious risk to our staff and others." The letter outlined numerous instances of violent conduct and actions taken therefor in Wilson's previous CYA commitment as well as the violent nature of the instant conviction. We consider this to be objective indicia of the likelihood that he would be a threat to security. Moreover, to the degree that a slim chance of error exists with reference to Wilson's CYA records, this possibility is dispelled by the fact that the CYA Director also considers the violent nature of the instant conviction.

With reference to Wilson's dignity interest, we note that he had the opportunity to participate, and in fact did submit a letter concerning his sentencing.

Turning last to the governmental interest, we find the significant cost in conducting a prerejection administrative hearing in connection with Wel-

---

[6] Because of his robbery conviction and the personal firearm-use enhancement, Wilson was statutorily ineligible for CYA commitment. (§ 1192.7, subd. (c)(8), (19); Welf. & Inst. Code, § 1732.5; *People v. Medler* (1986) 177 Cal.App.3d 927, 931-932 [223 Cal.Rptr. 401]; 67 Ops.Cal.Atty.Gen. 361, 362 (1984).)

fare and Institutions Code section 1731.5, subdivision (c), potential transferees to be an undue burden. While the record appears to indicate that Wilson had already been transported to a CYA facility we cannot determine whether he was located at the place of the agency's evaluation. Thus, the transportation, housing and processing costs, involved in a hearing present a substantial administrative burden.

Balancing the four *Ramirez* factors, it is clear that Wilson's less than substantial interest in CYA housing is outweighed by the minimal likelihood of an erroneous decision, the existence of some dignitary interest, and the significant cost to the public.

### VIII*

. . . . . . . . . . . . . . . . . . . . . .

### IX

The judgments against Jeffrey Windham and Carl Wilson are affirmed.

White, P. J., and Scott, J., concurred.

The petition of appellant Windham for review by the Supreme Court was denied January 7, 1988.

---

* Part VIII of this opinion is not certified for publication. (See fn., *ante*, p. 1580.)