Filed 1/30/15  P. v. Daniels CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>LESTER LEE DANIELS,<br><br>　　　Defendant and Appellant. | B246051<br><br>(Los Angeles County<br>Super. Ct. No. BA381454) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  John Fisher and Craig E. Veals, Judges.  Affirmed.

Elana Goldstein, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Linda C. Johnson, Supervising Deputy Attorney General, and Robert M. Snider, Deputy Attorney General, for Plaintiff and Respondent.

_____

Defendant Lester Lee Daniels appeals from the judgment entered following a jury trial in which he was convicted of two counts of selling, transporting, or offering to sell cocaine base.  Defendant contends the trial court erred by allowing the prosecutor to conceal the identity of an informant, who testified at trial, and excluding evidence of one of the informant's prior convictions.  Defendant also contests the amount of the restitution fine and parole revocation fine.  We affirm because defendant's contention is not supported by the record or the law.

## BACKGROUND

### 1.    The narcotics task force and Johnny A.

In early 2010, officers of the Los Angeles Police Department (LAPD), including Detective Craig Piantanida, and agents of the Federal Bureau of Investigation (FBI), including Special Agent Kevin Schadt, formed a joint narcotics task force targeting sellers in the LAPD's Southwest Division.  Members of the task force "cultivated" eight to ten informants, who were paid to make controlled purchases of narcotics while wearing equipment that transmitted live audio to the officers and agents and made an audio and video recording of the transactions.  To protect the ongoing investigation and the informants, the task force did not arrest any sellers following the controlled purchases.

One of the informants utilized by the task force was "Johnny A.,"[1] who had previously performed some controlled drug purchases for the LAPD, for which he had been paid a total of $300.  Johnny A. testified at trial he had become an LAPD informant because he wanted to "help clean up the streets."  He had wanted to be a police officer, but had a juvenile record.  A police sergeant he spoke to passed his name on to Piantanida, who became his handler.  At the time, Johnny A. had no cases pending against him and was compensated only with money.  Later, in December of 2011, Johnny

---

[1] On cross-examination, Johnny A. provided his real name.  To remain consistent with the parties' and the court's usage during trial, we refer to him as Johnny A.

A. was convicted of second degree burglary, but he received no leniency as a result of his work as an informant. He was on probation at the time he testified at defendant's trial.

The FBI paid Johnny A. a total of about $6,000, including relocation expenses, for his participation in 12 or 13 controlled purchases for the task force, which included two purchases from defendant that gave rise to the charges of which defendant was convicted in this case.

## 2. February 3 transaction (count 2)[2]

On February 3, 2010,[3] Johnny A. made a controlled purchase of cocaine base for the task force. Before he did so, Piantanida searched him to ensure he had no money or drugs on him, and Schadt equipped him with recording and transmitting equipment and provided $400 to make the purchase. Johnny A. then placed a recorded phone call to Brian Beck, his connection to a drug seller, during which they arranged a meeting place. The audio recording of that phone call was played at trial. Piantanida dropped off Johnny A. at the meeting place, Johnny A. got into Beck's car, and Beck drove to another location, where he and Johnny A. got into a van with defendant and an unidentified woman.

Defendant asked Johnny A. to "tell me how much you got altogether." Johnny A. replied, "I got five hundred but I only want to spend 250." Johnny A. suggested $100 or $200 would be acceptable also. Defendant said, "Just give me 250." Johnny A. testified he could not remember whether he handed the money directly to defendant or whether he handed it to Beck (who was sitting between Johnny A. and defendant) and Beck passed it on to defendant. Johnny A. then received what appeared to be rock cocaine from both defendant and the woman. After Johnny A. expressed concern about getting into an argument with persons to whom he might sell the cocaine, defendant said, "You gonna be cool and they gonna be happy with the quality because it's—that's some real good dope." Defendant added, "Everybody been giving us complements [*sic*] on that," and predicted

---

[2] As explained *post*, count 1 was dismissed.

[3] Undesignated dates pertain to 2010.

3

Johnny A. would "call back" for more. Johnny A. testified defendant, not the woman, was "in charge" and "directing" the transaction.

Beck dropped off Johnny A., who was then picked up by the task force. Johnny A. turned over the drugs and unspent money. Piantanida searched Johnny A. to make sure he had not retained any drugs or money. Later analysis revealed the three bindles Johnny A. purchased that day contained cocaine base and weighed about 4.6 grams.

An audio-video recording commencing with Johnny A.'s meeting with Beck, continuing through the purchase in defendant's van, and ending when Johnny A. was picked up by the task force after leaving Beck's car was played at trial.

3.      **March 17 transaction (count 3)**

Johnny A. made a second purchase of cocaine base from defendant for the benefit of the task force on March 17. The same procedures were utilized, including searching Johnny A. before the transaction and equipping him with recording and transmitting devices. Johnny A. phoned defendant to set up the meeting. Defendant did not answer, but phoned Johnny A. back. After defendant said he needed an hour, Johnny A. asked if he was "going to bring most of it?" Defendant replied, "Yeah, cause they just called me. When you say both of them, you mean both of the two hundred?" Johnny A. said, "Exactly." Defendant assured him, "I already got it," then explained he needed time because he had to pick up his child at school. An audio recording of that call and ensuing premeeting calls between defendant and Johnny A. were played at trial.

The task force dropped Johnny A. off near the meeting place and he walked to the front porch of a house where defendant was waiting. Several men were present, and the same woman who had been in the van during the February 3 transaction arrived while Johnny A. was there. Johnny A. gave defendant $400, and defendant gave him what appeared to be crack cocaine. As on February 3, defendant and the woman each provided some of the cocaine to Johnny A. Defendant explained, in apparent reference to the size of the rocks, "[Y]ou got four more of this size," "[a]nd I give you one from this size," "[b]ut I got more of this size." Defendant then asked Johnny A. if he wanted "some toilet paper or something to wrap it up with," and explained that was his own practice.

4

Johnny A. walked away and was picked up by the task force. As on February 3, Johnny A. turned over the drugs to the task force and Piantanida searched him. Later analysis revealed the 11 bindles Johnny A. purchased that day contained cocaine base and weighed about 6.6 grams.

An audio-video recording commencing as Johnny A. walked to the house where he met defendant, continuing through the purchase, and ending when Johnny A. arranged for the task force to pick him up was played at trial.

## 4. Defendant's arrest

Defendant was arrested on February 23, 2011, by LAPD officers who knew nothing of the task force's prior investigation involving defendant. Those officers observed defendant drive a van up alongside four men outside a motel. One-by-one, the men got into defendant's van for about 30 seconds, then "ran" into the motel. The officers believed this conduct reflected narcotics sales by defendant to the men. Defendant's van was followed to a gas station, where officers approached defendant, identified themselves, and spoke to him. Defendant admitted he was in possession of "rock," and gave them a package that contained about 14 grams of cocaine base. Defendant also had $346 in his pocket.

## 5. Defendant's trial testimony

Defendant testified he was a user, not a seller, of crack cocaine. Beck was a friend with whom defendant used drugs. The woman in the van on February 3, whom defendant knew only as "Chocolate," was the seller. In exchange for making the connection between Johnny A. and Chocolate, defendant received some crack cocaine from Chocolate. Defendant did not take part in the transaction, and only praised the quality of the drugs because Johnny A. or Beck complained about the amount Chocolate provided.

When Johnny A. called defendant for more drugs on March 17, defendant again arranged for Chocolate to sell Johnny A. drugs. Chocolate gave defendant some cocaine in exchange for arranging the transaction. Defendant did not receive any money from either sale to Johnny A.

5

Defendant further denied he was outside the motel on February 23, 2011, and that anyone got in and out of the van. He also denied that the police recovered any drugs from him. The money he had on him came from his job at an auto body shop.

Defendant admitted he had been convicted of robbery in 1997 and, under an alias, of attempted possession for sale of cocaine base in 2008. He was released from prison in January of 2010 and was on parole at the time of his arrest.

## 6. Verdict and sentencing

The jury convicted defendant of two counts of selling, transporting, or offering to sell cocaine base, which were based on the 2010 transactions. It could not reach a verdict on a charge of possessing cocaine base for sale, which was based on the events of February 23, 2011, and that charge was ultimately dismissed. The court found true allegations defendant had suffered two prior serious or violent felony convictions and served three prior prison terms. The court sentenced defendant to 10 years in prison.

## DISCUSSION

## 1. "Concealment" of informant's identity

Defendant contends the trial court erred by allowing the prosecution to conceal the informant's identity. He argues this error violated his constitutional rights to due process and confrontation.

### a. Proceedings in the trial court

As soon as Piantanida began referring to an "informant" in his preliminary hearing testimony, defense counsel objected and requested "that the name of the person be used." The court overruled the objections. On cross-examination, defense counsel asked Piantanida for the name of the informant. Piantanida invoked the privilege for an informant's identity. (Evid. Code, § 1041, subd. (a).)[4] After defense counsel inquired about the informant's criminal record, the prosecutor requested the court to hold an in camera hearing regarding disclosure of the identity and criminal history of the informant. Piantanida told the court he did not have a copy of the informant's "rap sheet" with him,

---

[4] Undesignated statutory references are to the Evidence Code.

6

and the court concluded a hearing was "unnecessary at this point." After the close of evidence, defense counsel argued, "[F]or each count, whether there's probable cause to suspect him is completely based upon the validity of the informant. . . . [W]e don't know his name and we don't know his criminal record. [¶] And I would argue that there has been insufficient evidence adduced to invoke any official privilege under 1041 and 1042 of the Evidence Code. And therefore I would move to dismiss . . . both counts." The court denied the motion and held defendant to answer on both charges.[5]

Defense counsel subsequently filed a Penal Code section 995 motion seeking to dismiss the information on the ground defendant was denied "a substantial right at the preliminary hearing, namely, his federal constitutional right to the identity of the sole witness/informant claiming personal knowledge that he committed the crimes charged in the information, without holding an in camera hearing pursuant to Evidence Code sections 1041 and 1042 to determine whether the investigating officer had good cause not to divulge the informant's identity." The court and the prosecutor were willing to have the motion heard the day it was filed, but defense counsel requested it be heard about two weeks later.

On the day the motion to dismiss was scheduled to be heard, defendant invoked his right to self-representation. The court declined to allow counsel to argue the motion if defendant wanted to represent himself. Defendant affirmed his desire to represent himself. The court held the request in abeyance. At the next hearing, five days later, defense counsel stated he was ready to proceed on the motion and provide a defense. Defendant nonetheless elected to represent himself, and the court granted his request.

In the ensuing five months of defendant's self-representation, he failed to even mention, let alone ask the court to rule on the Penal Code section 995 motion. He filed an "Informal Request for Discovery" that sought, inter alia, "[i]nformation and [r]eports" regarding how long the informant had been working for the FBI before "February 3, 2012

---

[5] The count from 2011 was filed separately, under a different case number. The two cases were consolidated after separate preliminary hearings had been conducted.

[*sic*]" and how the informant knew Beck. The request did not seek the identity or criminal history of the informant. Nor did defendant express a desire for disclosure of the informant's identity or criminal record at a hearing conducted the same day he filed his discovery request.

Less than one week later, defendant filed an "Addendum to defense Discovery Motion," stating he had not received, inter alia, "[a]ll and any criminal history of [informant]" or "[t]he name and brith [*sic*] date of the [informant] moral turpitude, arrest, or bad acts." At a hearing four days later, the court asked defendant about his discovery requests. Defendant talked about missing FBI reports, then mentioned his "supplemental motion" and said he "was asking for information on the informant for credibility purpose." Defendant told the court there had been a motion for disclosure of such information filed by the public defender about seven months earlier, but "they were never turned over and the public defender never questioned it." The court and the prosecutor remarked they could not find such a motion in the file, and the court stated, "[W]hat concerns me, as much as anything else, is I don't know to what extent this issue has been heard previously and some decision has been made. [¶] You're talking in terms of informants. I know that's an issue that's been heard already. I wasn't involved in that. And obviously, to the extent that there was some determination as far as that issue is concerned, it's a kind of touchy thing and I want to make sure that I don't run afoul of decisions that have been made previously." The court deferred any further action until the prosecutor assigned to the case was present.

At the next hearing on the case, defendant filed a "Motion to Compel Discovery" that stated the informant's criminal history had not been disclosed, but made no mention of his identity. In court, the prosecutor provided documents he said were responsive to specific categories in defendant's initial discovery request. Defendant argued an FBI report pertaining to the February 3 transaction and an LAPD report pertaining to the March 17 transaction were missing. The court stated, "So we need those two things. We'll work on that." Defendant said, "There's one other thing," and explained he wanted "reports and receipts" documenting payments to the informant. Defendant explained he

8

did not believe the informant was actually paid. The court directed the prosecutor to "investigate that also." Before the hearing concluded, the prosecutor and the court reiterated the three documents or types of documents defendant claimed were outstanding. No one, including defendant, mentioned disclosure of the informant's identity or criminal history.

At the next hearing, defendant again complained he was missing "the police report from March the 17th" and an FBI report pertaining to the February 3 transaction. The prosecutor provided defendant with the FBI report. The court repeatedly asked defendant if there was anything else he was missing, and defendant referred to another FBI report regarding February 3 and documentary evidence of payment to the informant. The court discussed each item with the parties, then asked defendant, "So anything else? . . . Is there any other issue we need to discuss?" Defendant referred to surveillance photos, and the prosecutor represented defendant had all such photos. The court again asked defendant, "Anything else?" Defendant replied, "At this time, no." A lengthy discussion of the evidence of payments to the informant followed, but defendant never mentioned disclosure of the informant's identity or criminal history.

A week later, defendant filed a "Discovery Motion for Sanctions." It listed "material evidence" defendant had not yet received, including, inter alia, the informant's "name and birthdate" and "criminal history . . . Wheeler conduct, moral turpitude."

The next hearing in the case was conducted 10 days later. The court asked about defendant's trial readiness. Defendant complained he still had not received all of the discovery. The court asked him what was missing. Defendant said he had received only field reports, nothing else. The court noted, "[W]e've spent an inordinate amount of time going over every individual piece of discovery that the People have versus what you claim the People should be providing you. [¶] And it seems to me that you pretty much have satisfied all of this; that what the People have, you have received. [¶] To the extent you're requesting additional things, they're not in the People's possession. They are reports that don't exist, that sort of thing . . . ." Defendant began arguing about FBI reports that he believed existed. The court asked, "What specifically is it that you're

9

talking about here?" Defendant told the court he wanted "M.D.T.s from the officers" for all three charged offenses. A lengthy discussion ensued concerning transcripts of radio transmissions between officers, documentation of payments to the informant, FBI reports defendant claimed existed and had not been disclosed, and the history of the discovery process in the case. Defendant never mentioned his prior request for, or a need for, disclosure of the informant's identity or criminal history.

At the next hearing, 19 days later, the court and the parties again discussed discovery, including the issue of documentation regarding payments to the informant and radio transmission transcripts. The court asked, "Is there anything else we need to talk about?" Defendant raised an issue about his investigator and his failure to obtain copies of the audio and video recordings. Defendant did not, however, mention his prior request for, or a need for, disclosure of the informant's identity or criminal history.

Defendant appeared twice more while representing himself, but on neither occasion did he mention his prior request for, or a need for, disclosure of the informant's identity or criminal history.

At the next hearing, defendant announced he wanted counsel, but complained he had "15 items on my discovery that was never turned over." Defendant specifically complained he had been unable to play the audio and video recordings and had no M.D.T. transcripts. The court appointed counsel and reset the trial. The trial date was continued six more times.

The case was sent to a different courtroom when the parties announced they were ready for trial. Defense counsel noted there was a Penal Code section 995 motion that had been filed, but not heard. The parties briefly argued the merits of the motion. The prosecutor informed the court the informant would be a witness at trial and there were audio and video recordings of the narcotics transactions in which the informant participated. Defense counsel stated, "So my understanding for the record the informant will be disclosed. [¶] The informant will be a witness obviously and my understanding also is that today at least I'll be given the—I don't need the name of the informant, but most importantly I'll be given the rap sheet, what he's on probation for. [¶] More

10

importantly my understanding [is] he was a paid informant. I'll be given the amounts of money he was paid." The court stated, "Well, my thinking now is that I would deny the 995. And discovery compliance apparently will be given to the defense with respect to what he just said."

Johnny A. testified four days later. On cross-examination, he volunteered his actual first name and, upon inquiry by defense counsel, he stated his surname and testified that was his "true and correct name." Johnny A. later stated his age.

### b. Relevant legal principles

Section 1041, subdivision (a) provides a public entity with "a privilege to refuse to disclose the identity of a person who has furnished information" purporting to disclose a violation of a law. "The prosecution, however, 'must disclose the name of an informant who is a material witness in a criminal case or suffer dismissal of the charges against the defendant. [Citation.]' [Citation.] 'An informant is a material witness if there appears, from the evidence presented, a reasonable possibility that he or she could give evidence on the issue of guilt that might exonerate the defendant,' on which issue the defendant has the burden of producing 'some' evidence." (*Davis v. Superior Court* (2010) 186 Cal.App.4th 1272, 1276 (*Davis*.)

An informant's status as a percipient witness or participant does not mean the informant is a "material witness" for the purpose of disclosure; the defendant must make the required showing of a reasonable possibility the informant could provide *exculpatory* evidence. (*Davis*, *supra*, 186 Cal.App.4th at p. 1277.) "[A]n informant is not a 'material witness' nor does his nondisclosure deny the defendant a fair trial where the informant's testimony although 'material' on the issue of guilt could only further implicate rather than exonerate the defendant." (*People v. Alderrou* (1987) 191 Cal.App.3d 1074, 1080–1081.) A "defendant's showing to obtain disclosure of an informant's identity must rise above the level of *sheer* or *unreasonable* speculation, and reach at least the low plateau of reasonable possibility." (*People v. Tolliver* (1975) 53 Cal.App.3d 1036, 1044.)

"[A] party may not challenge on appeal a procedural error or omission if the party acquiesced by failing to object or protest under circumstances indicating that the error or

11

omission probably was inadvertent.  [Citations.]  "'In the hurry of the trial many things may be, and are, overlooked which would readily have been rectified had attention been called to them.  The law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them."'  [Citations.]"  (*People v. Braxton* (2004) 34 Cal.4th 798, 813–814.)  Thus, where a trial court ""'through inadvertence or neglect, neither rules nor reserves its ruling"'" on a motion or objection, the party who made the motion or objection ""'"must make some effort to have the court *actually rule*.  If the point is not pressed and is forgotten, [the party] may be deemed to have waived or abandoned it, just as if he had failed to make the objection in the first place."'"  (*Id.* at p. 813.)

> **c.      The trial court did not err in failing to hold a hearing on defendant's discovery request.**

The trial court did not err by failing to hold a hearing on disclosure of the informant's identity, let alone by failing to order such disclosure, because defendant never made the requisite showing of a reasonable possibility the informant could provide evidence that might exonerate defendant.  As far as the court was ever informed, the informant could only provide evidence that incriminated defendant.  Thus, defendant failed to show the informant was a "material witness."  For the same reasons, defendant's Penal Code section 995 motion had no merit.

Furthermore, although defendant's first and third written discovery requests or motions requested the informant's name and date of birth, defendant never pressed the court to order disclosure of that information.  Indeed, throughout the course of numerous lengthy hearings regarding outstanding discovery, defendant never mentioned that the informant's name and date of birth had not been disclosed and he still needed them.  After defendant relinquished his propria persona status, his new attorney announced ready for trial and reached an agreement with the new prosecutor, pursuant to which "the informant [would] be disclosed," including the informant's criminal history and the payments he received for his work as an informant.  Counsel did not request any additional continuance of the trial.  It is unclear from the record whether the prosecutor

12

disclosed Johnny A.'s real name, but defense counsel said on the record he did not need the name, thereby abandoning all prior demands for disclosure of the name. For all of these reasons, defendant forfeited his appellate claim the trial court erred by failing to order disclosure of the informant's identity.

In any event, defendant was not prejudiced. Johnny A. revealed his real name and age on cross-examination. He remained on call to the defense at the conclusion of his testimony, and the presentation of evidence continued the next day. Had counsel believed the defense might have benefited from an investigation of Johnny A. using his real name, counsel could have requested a brief continuance. He did not do so, and thereby forfeited any claim defendant was prejudiced by the timing of Johnny A.'s disclosure. The delay in disclosure was itself neither error nor a violation of defendant's constitutional rights to confrontation and due process. (*People v. Valdez* (2012) 55 Cal.4th 82, 106–110 [in capital case, no violation of defendant's rights where identities of witnesses disclosed several hours to a day before they testified at trial].)

Even if defendant had a viable claim and had preserved it, any delay in disclosure or nondisclosure was harmless beyond a reasonable doubt. Defendant had abundant impeachment material regarding Johnny A. The testimony of Piantanida, Schadt, and Johnny A. established that he was a paid informant and was, in fact, paid for the transactions giving rise to the charges of which defendant was convicted. Evidence of Johnny A.'s burglary conviction was admitted, and the jury was instructed it could consider a witness's felony conviction as reflecting upon his or her credibility. In addition, Johnny A. testified he had additional criminal history as a juvenile, that he was a "registered actor" who appeared in movies and short films, and that he was "acting" while testifying.

In addition, Johnny A.'s testimony was partially corroborated by the audio and video recordings and circumstantial evidence. The officers searched Johnny A. before dropping him off for each purchase to make sure he had no drugs on him, then provided him with money to make the purchase, and dropped him off. They monitored his actions by listening to the audio transmission from the time he was dropped off until he was

13

picked up, and the simultaneously recorded audios and videos were played at trial. During those purchases, defendant made statements consistent with Johnny A.'s testimony that defendant sold him drugs. When task force officers picked Johnny A. up, he had drugs and either no money or less money than Schadt had provided to him.

Finally, over the prosecutor's objection, the court gave a special jury instruction written by defense counsel: "'The testimony of an informant should be viewed with caution. In evaluating such testimony you should consider the extent to which it may have been influenced by the receipt of money given by law enforcement. [¶] This does not mean that you may arbitrarily disregard such testimony, but you should give it the weight to which you find it to be entitled in light of all the other evidence in the case.'"

For all of these reasons, defendant was not prejudiced by delayed disclosure of Johnny A.'s real name and criminal history. Defendant's argument that he was prejudiced by being unable to investigate whether Johnny A. had additional criminal history, a reputation for dishonesty, harbored other motives for testifying against defendant, or made inconsistent statements amount to nothing more than speculation. If defendant had had more information at an earlier time he *could* have conducted an investigation and *might* have found additional impeachment material that *might* have caused the jury to conclude Johnny A. was not credible and *might* have affected the outcome of the case. Such speculation does not amount to a reasonable possibility that the jury would have rendered a different verdict absent the purported error. (*People v. Ochoa* (1998) 19 Cal.4th 353, 479.)

We note that although defendant's appellate claim is repeatedly and expressly directed to the purported concealment of Johnny A.'s identity, defendant repeatedly asserts he never received Johnny A.'s "rap sheet." Assuming, for the sake of argument, that defendant's claim actually encompasses this purported omission, we reject it as unsupported by the record. The prosecutor made a commitment to give defense counsel the informant's "rap sheet," and the next day she referred to having turned over the "rap sheet." Defense counsel never complained that she had not done so. While discussing which of Johnny A.'s prior convictions would be admissible for impeachment, defense

14

counsel asked the dates of the domestic violence and burglary convictions, but then said, "I just saw the two and not the one. Sorry." Defendant argues the inquiry regarding the date of the convictions demonstrates defense counsel did not have the "rap sheet," but his reference to what he saw suggests he was looking at it and was merely confused by the numbers. Accordingly, the record simply does not support defendant's assertion.

In the context of his third appellate issue, defendant requests this court to review sealed documents relating to Johnny A. The appellate record contains no such records. Indeed, nothing indicates such records were part of the trial court's record.

## 2. Exclusion of evidence of informant's domestic violence conviction

Defendant contends the trial court abused its discretion by excluding evidence of Johnny A.'s domestic violence conviction, and that this error denied him effective cross-examination, thereby violating his due process and confrontation rights.

### a. Proceedings in the trial court

Johnny A. had two felony convictions from 2011: a March domestic violence conviction and a December burglary conviction. When the court initially addressed the admissibility of these convictions before trial, it ruled the burglary conviction admissible, but reserved a ruling on the domestic violence conviction. When it returned to the issue just before Johnny A. testified, the court excluded the domestic violence conviction over defendant's objection. The court, which had already heard the testimony of Piantanida and Schadt regarding both the use of recording equipment during the controlled purchases and payment to Johnny A. for his participation, asked the prosecutor whether Johnny A.'s participation had been recorded. She confirmed it was on audio and video. The court stated that in balancing the probative value of the conviction against the risk of prejudice its admission would create, as required by section 352, it considered that Johnny A.'s credibility was "really . . . not at—that much at issue in the sense that basically it's on tape as I understand it. [¶] So I don't feel it's necessary to load him up with prior felony convictions."

15

**b.      Relevant legal principles**

Section 352 provides that the court may, in its discretion, exclude relevant evidence if its probative value is substantially outweighed by the probability that its admission will either be unduly time consuming or create a substantial danger of undue prejudice, confusion of the issues, or misleading the jury.

Subject to section 352, past misconduct, including convictions, involving moral turpitude is admissible to impeach a witness in a criminal trial.  (*People v. Wheeler* (1992) 4 Cal.4th 284, 295–296.)  In exercising its discretion, the trial court should consider the relationship between a prior conviction and credibility and its nearness or remoteness in time.  (*People v. Clair* (1992) 2 Cal.4th 629, 654.)  Other relevant circumstances may also be considered.  (*People v. Collins* (1986) 42 Cal.3d 378, 392.)  Whether "'more than one prior felony should be admitted is simply one of the factors which must be weighed against the danger of prejudice.'"  (*People v. Green* (1995) 34 Cal.App.4th 165, 183.)  On appeal, the trial court's decision is reviewed for abuse of discretion.  (*Clair*, at p. 655.)

Where, as here, a discretionary power is vested in the trial court, its exercise of that discretion will not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.  (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.)  Defendant bears the burden of establishing a prejudicial abuse of discretion.  (*People v. Windham* (1987) 194 Cal.App.3d 1580, 1592.)

**c.      The trial court did not abuse its discretion.**

The trial court expressly balanced the probative value of Johnny A.'s domestic violence conviction against the risk of undue prejudice and concluded the probative value was substantially outweighed by the risk of undue prejudice.  Johnny A.'s domestic violence conviction was less probative of credibility than his burglary conviction because burglary reflects dishonesty, whereas domestic violence does not.  Given the existence of the burglary conviction and Johnny A.'s status as a paid informant, as well some corroborative evidence in the form of recordings and the circumstantial evidence

16

addressed in the context of the prior issue, we cannot conclude the trial court's exclusion of evidence of the domestic violence conviction was arbitrary, capricious, or patently absurd. Nor did its exclusion result in a manifest miscarriage of justice, given the other impeachment evidence regarding Johnny A., including matters that emerged during his testimony, as addressed in the context of the prior issue.

With respect to defendant's argument that exclusion of this conviction violated his constitutional rights by hampering his ability to cross-examine Johnny A., we note that the confrontation clause simply guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense wishes. (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679 [106 S.Ct. 1431].) Judges retain wide latitude to impose reasonable limits on cross-examination. (*People v. Quartermain* (1997) 16 Cal.4th 600, 623.) In particular, a trial court may restrict cross-examination pursuant to section 352. (*Quartermain*, at p. 623.) Confrontation rights are not violated unless a defendant shows that the prohibited cross-examination would have produced a significantly different impression of the witness's credibility. (*Id.* at pp. 623–624.) Defendant has not shown, indeed cannot show, the jury would have had a significantly different impression of Johnny A. if it had learned of his domestic violence conviction.

## 3. Amount of restitution fine and parole revocation fine

Defendant contends the trial court erred by imposing a $5,000 restitution fine and parole revocation fine because the trial court neither adhered to the statutory formula nor explained its reasons for the amount it selected.

Penal Code section 1202.4, subdivision (b), provides, in pertinent part: "In every case where a person is convicted of a crime, the court shall impose a separate and additional restitution fine, unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record." "The restitution fine shall be set at the discretion of the court and commensurate with the seriousness of the offense," but cannot be less than the statutory minimum or more than $10,000. (Pen. Code, § 1202.4, subd. (b)(1).) In 2010, when defendant committed the crimes of which he was convicted, the

statutory minimum was $200. The statute sets forth a formula the court may use to calculate the amount of the fine: "[T]he court may determine the amount of the fine as the product of the minimum fine . . . multiplied by the number of years of imprisonment the defendant is ordered to serve, multiplied by the number of felony counts of which the defendant is convicted." (Pen. Code, § 1202.4, subd. (b)(2).)

Where the sentence imposed includes a period of parole and the court imposes a restitution fine under Penal Code section 1202.4, subdivision (b), it must also impose a parole revocation fine in an equal amount. (Pen. Code, § 1202.45.) The latter fine is suspended unless the defendant's parole is revoked.

Applying the statutory formula and using the statutory minimum fine applicable at the time defendant committed the crimes of which he was convicted, the fines would have been $4,000 each. Application of the statutory formula is not mandatory, however, and the court is not required to explain its reasons for imposing a fine within the statutory minimum to maximum range. (*People v. Romero* (1985) 167 Cal.App.3d 1148, 1156.) The fines imposed were well within the statutory range, and were thus a proper exercise of the court's discretion.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.


                                        BENDIX, J.*

We concur:


ROTHSCHILD, P. J.


CHANEY, J.

---

**\*** Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.